YOUNGBERG, SUPERINTENDENT, PENNHURST
STATE SCHOOL AND HOSPITAL, ET AL. *v.* ROMEO,
AN INCOMPETENT, BY HIS MOTHER
AND NEXT FRIEND, ROMEO

No. 80–1429.   Argued January 11, 1982—Decided June 18, 1982

Powell, J., delivered the opinion of the Court, in which Brennan, White, Marshall, Blackmun, Rehnquist, Stevens, and O'Connor, JJ., joined. Blackmun, J., filed a concurring opinion, in which Brennan and O'Connor, JJ., joined, *post*, p. 325. Burger, C. J., filed an opinion concurring in the judgment, *post*, p. 329.

*David H. Allshouse*, Deputy Attorney General of Pennsylvania, argued the cause for petitioners. With him on the briefs were *Leroy S. Zimmerman*, Attorney General, and *Robert B. Hoffman* and *Allen C. Warshaw*, Deputy Attorneys General.

*Edmond A. Tiryak* argued the cause for respondent. With him on the brief were *Ralph J. Moore, Jr.*, and *William F. Sheehan.**

---

*A brief for the State of Connecticut et al. as *amici curiae* urging reversal was filed by *Carl R. Ajello*, Attorney General of Connecticut, and *Hugh Barber, Richard T. Couture*, and *Francis J. Mac Gregor*, Assistant Attorneys General, *Charles A. Graddick*, Attorney General of Alabama, and *R. Emmett Poundstone III*, Assistant Attorney General, *Robert K. Corbin*, Attorney General of Arizona, and *Anthony B. Ching*, Assistant Attorney General, *Steve Clark*, Attorney General of Arkansas, and *Robert R. Ross*, Deputy Attorney General, *Jim Smith*, Attorney General of Florida, *Linley E. Pearson*, Attorney General of Indiana, *Robert T. Stephan*, Attorney General of Kansas, *William J. Guste, Jr.*, Attorney General of Louisiana, *James E. Tierney*, Attorney General of Maine, *Frank J. Kelley*, Attorney General of Michigan, *Paul L. Douglas*, Attorney General of Nebraska, *Gregory H. Smith*, Attorney General of New Hampshire, *James R. Zazzali*, Attorney General of New Jersey, *Robert O. Wefald*, Attorney General of North Dakota, *William J. Brown*, Attorney General of Ohio, *David B. Frohnmayer*, Attorney General of Oregon, *Dennis J. Roberts II*, Attorney General of Rhode Island, *Daniel R. McLeod*, Attorney General of South Carolina, *Marshall Coleman*, Attorney General of Virginia, *Kenneth O. Eikenberry*, Attorney General of Washington, and *Chauncey H. Browning, Jr.*, Attorney General of West Virginia.

Briefs of *amici curiae* urging affirmance were filed by *Margaret F. Ewing, Paul R. Friedman*, and *Jane Bloom Yohalem* for the American Orthopsychiatric Association et al.; and by *Dan Stormer* and *Mary Burdick* for Mental Health Advocacy Services et al.

*H. Bartow Farr III* filed a brief for the American Psychiatric Association as *amicus curiae*.

JUSTICE POWELL delivered the opinion of the Court.

The question presented is whether respondent, involuntarily committed to a state institution for the mentally retarded, has substantive rights under the Due Process Clause of the Fourteenth Amendment to (i) safe conditions of confinement; (ii) freedom from bodily restraints; and (iii) training or "habilitation."[1] Respondent sued under 42 U. S. C. § 1983 three administrators of the institution, claiming damages for the alleged breach of his constitutional rights.

I

Respondent Nicholas Romeo is profoundly retarded. Although 33 years old, he has the mental capacity of an 18-month-old child, with an I. Q. between 8 and 10. He cannot talk and lacks the most basic self-care skills. Until he was 26, respondent lived with his parents in Philadelphia. But after the death of his father in May 1974, his mother was unable to care for him. Within two weeks of the father's death, respondent's mother sought his temporary admission to a nearby Pennsylvania hospital.

Shortly thereafter, she asked the Philadelphia County Court of Common Pleas to admit Romeo to a state facility on a permanent basis. Her petition to the court explained that she was unable to care for Romeo or control his violence.[2] As part of the commitment process, Romeo was examined by a physician and a psychologist. They both certified that re-

---

[1] The American Psychiatric Association explains: "The word 'habilitation,' . . . is commonly used to refer to programs for the mentally-retarded because mental retardation is . . . a learning disability and training impairment rather than an illness. [T]he principal focus of habilitation is upon training and development of needed skills." Brief for American Psychiatric Association as *Amicus Curiae* 4, n. 1.

[2] Mrs. Romeo's petition to the Court of Common Pleas stated: "Since my husband's death I am unable to handle him. He becomes violent—Kicks, punches, breaks glass; He can't speak—wants to express himself but can't. He is [a] constant 24 hr. care. [W]ithout my husband I am unable to care for him." App. 18a.

spondent was severely retarded and unable to care for himself. App. 21a–22a and 28a–29a. On June 11, 1974, the Court of Common Pleas committed respondent to the Pennhurst State School and Hospital, pursuant to the applicable involuntary commitment provision of the Pennsylvania Mental Health and Mental Retardation Act, Pa. Stat. Ann., Tit. 50, § 4406(b) (Purdon 1969).

At Pennhurst, Romeo was injured on numerous occasions, both by his own violence and by the reactions of other residents to him. Respondent's mother became concerned about these injuries. After objecting to respondent's treatment several times, she filed this complaint on November 4, 1976, in the United States District Court for the Eastern District of Pennsylvania as his next friend. The complaint alleged that "[d]uring the period July, 1974 to the present, plaintiff has suffered injuries on at least sixty-three occasions." The complaint originally sought damages and injunctive relief from Pennhurst's director and two supervisors;[3] it alleged that these officials knew, or should have known, that Romeo was suffering injuries and that they failed to institute appropriate preventive procedures, thus violating his rights under the Eighth and Fourteenth Amendments.

Thereafter, in late 1976, Romeo was transferred from his ward to the hospital for treatment of a broken arm. While in the infirmary, and by order of a doctor, he was physically restrained during portions of each day.[4] These restraints were ordered by Dr. Gabroy, not a defendant here, to protect

---

[3] Petitioner Duane Youngberg was the Superintendent of Pennhurst; he had supervisory authority over the entire facility. Petitioner Richard Matthews was the Director of Resident Life at Pennhurst. Petitioner Marguerite Conley was Unit Director for the unit in which respondent lived. According to respondent, petitioners are administrators, not medical doctors. See Brief for Respondent 2. Youngberg and Matthews are no longer at Pennhurst.

[4] Although the Court of Appeals described these restraints as "shackles," "soft" restraints, for the arms only, were generally used. 7 Tr. 53–55.

Romeo and others in the hospital, some of whom were in traction or were being treated intravenously. 7 Tr. 40, 49, 76–78. Although respondent normally would have returned to his ward when his arm healed, the parties to this litigation agreed that he should remain in the hospital due to the pending lawsuit. 5 *id.*, at 248; 6 *id.*, at 57–58 and 137. Nevertheless, in December 1977, a second amended complaint was filed alleging that the defendants were restraining respondent for prolonged periods on a routine basis. The second amended complaint also added a claim for damages to compensate Romeo for the defendants' failure to provide him with appropriate "treatment or programs for his mental retardation."[5] All claims for injunctive relief were dropped prior to trial because respondent is a member of the class seeking such relief in another action.[6]

An 8-day jury trial was held in April 1978. Petitioners introduced evidence that respondent participated in several programs teaching basic self-care skills.[7] A comprehensive behavior-modification program was designed by staff members to reduce Romeo's aggressive behavior,[8] but that program was never implemented because of his mother's objec-

---

[5] Respondent uses "treatment" as synonymous with "habilitation" or "training." See Brief for Respondent 21–23.

[6] *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981) (remanded for further proceedings).

[7] Prior to his transfer to Pennhurst's hospital ward, Romeo participated in programs dealing with feeding, showering, drying, dressing, self-control, and toilet training, as well as a program providing interaction with staff members. Defendants' Exhibit 10; 3 Tr. 69–70; 5 *id.*, at 44–56, 242–250; 6 *id.*, at 162–166; 7 *id.*, at 41–48.

Some programs continued while respondent was in the hospital, 5 *id.*, at 227, 248, 256; 6 *id.*, at 50, 162–166; 6 *id.*, at 32, 34, 41–48, and they reduced respondent's aggressive behavior to some extent, 7 *id.*, at 45.

[8] 2 *id.*, at 7; 5 *id.*, at 88–90; 6 *id.*, at 88, 200–203; Defendants' Exhibit 1, p. 9. The program called for short periods of separation from other residents and for use of "muffs" on plaintiff's hands for short periods of time, *i. e.*, five minutes, to prevent him from harming himself or others.

tions.[9]  Respondent introduced evidence of his injuries and of conditions in his unit.[10]

At the close of the trial, the court instructed the jury that "if any or all of the defendants were aware of and failed to take all reasonable steps to prevent repeated attacks upon Nicholas Romeo," such failure deprived him of constitutional rights.  App. 73a.  The jury also was instructed that if the defendants shackled Romeo or denied him treatment "as a punishment for filing this lawsuit," his constitutional rights were violated under the Eighth Amendment.  *Id.*, at 73a–75a.  Finally, the jury was instructed that only if they found the defendants "deliberate[ly] indifferen[t] to the serious medical [and psychological] needs" of Romeo could they find that his Eighth and Fourteenth Amendment rights had been violated.  *Id.*, at 74a–75a.[11]  The jury returned a verdict for the defendants, on which judgment was entered.

The Court of Appeals for the Third Circuit, sitting en banc, reversed and remanded for a new trial.  644 F. 2d 147 (1980).  The court held that the Eighth Amendment, prohibiting cruel and unusual punishment of those convicted of crimes, was not an appropriate source for determining the rights of the involuntarily committed.  Rather, the Fourteenth Amendment and the liberty interest protected by that Amendment provided the proper constitutional basis for these rights.  In ap-

---

[9] 1 Tr. 53; 4 *id.*, at 25; 6 *id.*, at 204.

[10] The District Judge refused to allow testimony by two of Romeo's witnesses—trained professionals—indicating that Romeo would have benefited from more or different training programs.  The trial judge explained that evidence of the advantages of alternative forms of treatment might be relevant to a malpractice suit, but was not relevant to a constitutional claim under § 1983.  App. to Pet. for Cert. 101.

[11] The "deliberate indifference" standard was adopted by this Court in *Estelle* v. *Gamble*, 429 U. S. 97, 104 (1976), a case dealing with prisoners' rights to punishment that is not "cruel and unusual" under the Eighth Amendment.  Although the District Court did not refer to *Estelle* v. *Gamble* in charging the jury, it erroneously used the deliberate-indifference standard articulated in that case.  See App. 45a, 75a.

plying the Fourteenth Amendment, the court found that the involuntarily committed retain liberty interests in freedom of movement and in personal security. These were "fundamental liberties" that can be limited only by an "overriding, non-punitive" state interest. *Id.*, at 157–158 (footnote omitted). It further found that the involuntarily committed have a liberty interest in habilitation designed to "treat" their mental retardation. *Id.*, at 164–170.[12]

The en banc court did not, however, agree on the relevant standard to be used in determining whether Romeo's rights had been violated.[13] Because physical restraint "raises a presumption of a punitive sanction," the majority of the Court of Appeals concluded that it can be justified only by "compelling necessity." *Id.*, at 159–160 (footnote omitted). A somewhat different standard was appropriate for the failure to provide for a resident's safety. The majority considered that such a failure must be justified by a showing of "substantial necessity." *Id.*, at 164. Finally, the majority held that when treatment has been administered, those responsible are liable only if the treatment is not "acceptable in the light of present medical or other scientific knowledge." *Id.*, at 166–167 and 173.[14]

---

[12] The Court of Appeals used "habilitation" and "treatment" as synonymous, though it regarded "habilitation" as more accurate in describing treatment needed by the mentally retarded. See 644 F. 2d, at 165, and n. 40.

[13] The existence of a qualified immunity defense was not at issue on appeal. The defendants had received instructions on this defense, App. 76a, and it was not challenged by respondent. 644 F. 2d, at 173, n. 1. After citing *Pierson* v. *Ray*, 386 U. S. 547 (1967), and *Scheuer* v. *Rhodes*, 416 U. S. 232 (1974), the majority of the Court of Appeals noted that such instructions should be given again on the remand. 644 F. 2d, at 171–172.

[14] Actually, the court divided the right-to-treatment claim into three categories and adopted three standards, but only the standard described in text is at issue before this Court. The Court of Appeals also stated that if a jury finds that *no* treatment has been administered, it may hold the institution's administrators liable unless they can provide a compelling explana-

Chief Judge Seitz, concurring in the judgment, considered the standards articulated by the majority as indistinguishable from those applicable to medical malpractice claims. In Chief Judge Seitz' view, the Constitution "only requires that the courts make certain that professional judgment in fact was exercised." *Id.*, at 178. He concluded that the appropriate standard was whether the defendants' conduct was "such a substantial departure from accepted professional judgment, practice, or standards in the care and treatment of this plaintiff as to demonstrate that the defendants did not base their conduct on a professional judgment." *Ibid.*[15]

We granted the petition for certiorari because of the importance of the question presented to the administration of state institutions for the mentally retarded. 451 U. S. 982 (1981).

## II

We consider here for the first time the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment to the Constitution.[16] In this

---

tion for the lack of treatment, *id.*, at 165, 173, but respondent does not discuss this precise standard in his brief and it does not appear to be relevant to the facts of this case. In addition, the court considered "least intrusive" analysis appropriate to justify severe intrusions on individual dignity, such as permanent physical alteration or surgical intervention, *id.*, at 165–166 and 173, but respondent concedes that this issue is not present in this case.

[15] Judge Aldisert joined Chief Judge Seitz' opinion, but wrote separately to emphasize the nature of the difference between the majority opinion and that of the Chief Judge. On a conceptual level, Judge Aldisert thought that the court erred in abandoning the common-law method of deciding the case at bar rather than articulating broad principles unconnected with the facts of the case and of uncertain meaning. *Id.*, at 182–183. And, on a pragmatic level, Judge Aldisert warned that neither juries nor those administering state institutions would receive guidance from the "amorphous constitutional law tenets" articulated in the majority opinion. *Id.*, at 184. See *id.*, at 183–185.

Judge Garth also joined Chief Judge Seitz' opinion, and wrote separately to criticize the majority for addressing issues not raised by the facts of this case. *Id.*, at 186.

[16] In pertinent part, that Amendment provides that a State cannot de-

case, respondent has been committed under the laws of Pennsylvania, and he does not challenge the commitment. Rather, he argues that he has a constitutionally protected liberty interest in safety, freedom of movement, and training within the institution; and that petitioners infringed these rights by failing to provide constitutionally required conditions of confinement.

The mere fact that Romeo has been committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment. See, e. g., *Vitek* v. *Jones*, 445 U. S. 480, 491–494 (1980). Indeed, the State concedes that respondent has a right to adequate food, shelter, clothing, and medical care.[17] We must decide whether liberty interests also exist in safety, freedom of movement, and training. If such interests do exist, we must further decide whether they have been infringed in this case.

### A

Respondent's first two claims involve liberty interests recognized by prior decisions of this Court, interests that involuntary commitment proceedings do not extinguish.[18] The first is a claim to safe conditions. In the past, this Court has noted that the right to personal security constitutes a "historic liberty interest" protected substantively by the Due Process Clause. *Ingraham* v. *Wright*, 430 U. S. 651, 673 (1977). And that right is not extinguished by lawful confinement, even for penal purposes. See *Hutto* v. *Finney*, 437 U. S. 678 (1978). If it is cruel and unusual punishment to

---

prive "any person of life, liberty, or property, without due process of law . . . ." U. S. Const., Amdt. 14, § 1.

Respondent no longer relies on the Eighth Amendment as a direct source of constitutional rights. See Brief for Respondent 13, n. 12.

[17] Brief for Petitioners 8, 11, 12, and n. 10; Brief for Respondent 15–16. See also Brief for State of Connecticut et al. as *Amici Curiae* 8. Petitioners argue that they have fully protected these interests.

[18] Petitioners do not appear to argue to the contrary. See Brief for Petitioners 27–31.

hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions.

Next, respondent claims a right to freedom from bodily restraint. In other contexts, the existence of such an interest is clear in the prior decisions of this Court. Indeed, "[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1, 18 (1979) (POWELL, J., concurring in part and dissenting in part). This interest survives criminal conviction and incarceration. Similarly, it must also survive involuntary commitment.

## B

Respondent's remaining claim is more troubling. In his words, he asserts a "constitutional right to minimally adequate habilitation." Brief for Respondent 8, 23, 45. This is a substantive due process claim that is said to be grounded in the liberty component of the Due Process Clause of the Fourteenth Amendment.[19] The term "habilitation," used in psychiatry, is not defined precisely or consistently in the opinions below or in the briefs of the parties or the *amici*.[20] As

---

[19] Respondent also argues that because he was committed for care and treatment under state law he has a state substantive right to habilitation, which is entitled to substantive, not procedural, protection under the Due Process Clause of the Fourteenth Amendment. But this argument is made for the first time in respondent's brief to this Court. It was not advanced in the courts below, and was not argued to the Court of Appeals as a ground for reversing the trial court. Given the uncertainty of Pennsylvania law and the lack of any guidance on this issue from the lower federal courts, we decline to consider it now. See *Dothard* v. *Rawlinson*, 433 U. S. 321, 323, n. 1 (1977); *Duignan* v. *United States*, 274 U. S. 195, 200 (1927); *Old Jordan Milling Co.* v. *Société Anonyme des Mines*, 164 U. S. 261, 264–265 (1896).

[20] Professionals in the habilitation of the mentally retarded disagree strongly on the question whether effective training of all severely or profoundly retarded individuals is even possible. See, *e. g.*, Favell, Risley,

noted previously in n. 1, *supra*, the term refers to "training and development of needed skills." Respondent emphasizes that the right he asserts is for "minimal" training, see Brief for Respondent 34, and he would leave the type and extent of training to be determined on a case-by-case basis "in light of present medical or other scientific knowledge," *id.*, at 45.

In addressing the asserted right to training, we start from established principles. As a general matter, a State is under no constitutional duty to provide substantive services for those within its border. See *Harris* v. *McRae*, 448 U. S. 297, 318 (1980) (publicly funded abortions); *Maher* v. *Roe*, 432 U. S. 464, 469 (1977) (medical treatment). When a person is institutionalized—and wholly dependent on the State—it is conceded by petitioners that a duty to provide certain services and care does exist, although even then a State necessarily has considerable discretion in determining the nature and scope of its responsibilities. See *Richardson* v. *Belcher*, 404 U. S. 78, 83–84 (1971); *Dandridge* v. *Williams*, 397 U. S. 471, 478 (1970). Nor must a State "choose between attacking every aspect of a problem or not attacking the problem at all." *Id.*, at 486–487.

Respondent, in light of the severe character of his retardation, concedes that no amount of training will make possible his release. And he does not argue that if he were still at home, the State would have an obligation to provide training at its expense. See Tr. of Oral Arg. 33. The record reveals that respondent's primary needs are bodily safety and a minimum of physical restraint, and respondent clearly claims

---

Wolfe, Riddle, & Rasmussen, The Limits of Habilitation: How Can We Identify Them and How Can We Change Them?, 1 Analysis and Intervention in Developmental Disabilities 37 (1981); Bailey, Wanted: A Rational Search for the Limiting Conditions of Habilitation in the Retarded, 1 Analysis and Intervention in Developmental Disabilities 45 (1981); Kauffman & Krouse, The Cult of Educability: Searching for the Substance of Things Hoped for; The Evidence of Things Not Seen, 1 Analysis and Intervention in Developmental Disabilities 53 (1981).

training related to these needs.[21]   As we have recognized
that there is a constitutionally protected liberty interest in
safety and freedom from restraint, *supra*, at 315–316, train-
ing may be necessary to avoid unconstitutional infringement
of those rights.   On the basis of the record before us, it is
quite uncertain whether respondent seeks any "habilitation"
or training unrelated to safety and freedom from bodily re-
straints.   In his brief to this Court, Romeo indicates that
even the self-care programs he seeks are needed to reduce
his aggressive behavior.   See Brief for Respondent 21–22,
50.   And in his offer of proof to the trial court, respondent
repeatedly indicated that, if allowed to testify, his experts
would show that additional training programs, including self-
care programs, were needed to reduce his aggressive behav-
ior.   App. to Pet. for Cert. 98a–104a.[22]   If, as seems the
case, respondent seeks only training related to safety and
freedom from restraints, this case does not present the diffi-
cult question whether a mentally retarded person, involun-
tarily committed to a state institution, has some general con-
stitutional right to training *per se*, even when no type or
amount of training would lead to freedom.[23]

Chief Judge Seitz, in language apparently adopted by re-
spondent, observed:

"I believe that the plaintiff has a constitutional right to
minimally adequate care and treatment.   The existence

---

[21] See, *e. g.*, description of complaint, *supra*, at 310.

[22] See also Brief for Appellant in No. 78–1982, pp. 11–14, 20–21, and 24
(CA3).

[23] In the trial court, respondent asserted that "state officials at a state
mental hospital have a duty to provide residents . . . with such treatment
as will afford them a reasonable opportunity to acquire and maintain those
life skills necessary to cope as effectively as their capacities permit."   App.
to Pet. for Cert. 94a–95a.   But this claim to a sweeping *per se* right was
dropped thereafter.   In his brief to this Court, respondent does not repeat
it and, at oral argument, respondent's counsel explicitly disavowed any
claim that respondent is constitutionally entitled to such treatment as
would enable him "to achieve his maximum potential."   Tr. of Oral Arg.
46–48.

of a constitutional right to care and treatment is no longer a novel legal proposition." 644 F. 2d, at 176.

Chief Judge Seitz did not identify or otherwise define— beyond the right to reasonable safety and freedom from physical restraint—the "minimally adequate care and treatment" that appropriately may be required for this respondent.[24] In the circumstances presented by this case, and on the basis of the record developed to date, we agree with his view and conclude that respondent's liberty interests require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint. In view of the kinds of treatment sought by respondent and the evidence of record, we need go no further in this case.[25]

### III

### A

We have established that Romeo retains liberty interests in safety and freedom from bodily restraint. Yet these in-

---

[24] Chief Judge Seitz used the term "treatment" as synonymous with training or habilitation. See 644 F. 2d, at 181.

[25] It is not feasible, as is evident from the variety of language and formulations in the opinions below and the various briefs here, to define or identify the type of training that may be required in every case. A court properly may start with the generalization that there is a right to minimally adequate training. The basic requirement of adequacy, in terms more familiar to courts, may be stated as that training which is reasonable in light of identifiable liberty interests and the circumstances of the case. A federal court, of course, must identify a constitutional predicate for the imposition of any affirmative duty on a State.

Because the facts in cases of confinement of mentally retarded patients vary widely, it is essential to focus on the facts and circumstances of the case before a court. Judge Aldisert, in his concurring opinion in the court below, was critical of the "majority's abandonment of incremental decision-making in favor of promulgation of broad standards . . . [that] lac[k] utility for the groups most affected by this decision." *Id.*, at 183–184. Judge Garth agreed that reaching issues not presented by the case requires a court to articulate principles and rules of law in "the absence of an appropriate record . . . and without the benefit of analysis, argument, or briefing" on such issues. *Id.*, at 186.

terests are not absolute; indeed to some extent they are in conflict. In operating an institution such as Pennhurst, there are occasions in which it is necessary for the State to restrain the movement of residents—for example, to protect them as well as others from violence.[26] Similar restraints may also be appropriate in a training program. And an institution cannot protect its residents from all danger of violence if it is to permit them to have any freedom of movement. The question then is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint or lack of absolute safety is such as to violate due process.

In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance "the liberty of the individual" and "the demands of an organized society." *Poe* v. *Ullman,* 367 U. S. 497, 542 (1961) (Harlan, J., dissenting). In seeking this balance in other cases, the Court has weighed the individual's interest in liberty against the State's asserted reasons for restraining individual liberty. In *Bell* v. *Wolfish,* 441 U. S. 520 (1979), for example, we considered a challenge to pretrial detainees' confinement conditions. We agreed that the detainees, not yet convicted of the crime charged, could not be punished. But we upheld those restrictions on liberty that were reasonably related to legitimate government objectives and not tantamount to punishment.[27] See *id.,* at 539. We have taken a

---

[26] In Romeo's case, there can be no question that physical restraint was necessary at times. See n. 2, *supra.*

[27] See also *Jackson* v. *Indiana,* 406 U. S. 715, 738 (1972) (holding that an incompetent pretrial detainee cannot, after a competency hearing, be held indefinitely without either criminal process or civil commitment; due process requires, at a minimum, some rational relation between the nature and duration of commitment and its purpose). This case differs in critical respects from *Jackson,* a procedural due process case involving the validity of an involuntary commitment. Here, respondent was committed by a court on petition of his mother who averred that in view of his condition she could neither care for him nor control his violence. N. 2, *supra.* Thus,

similar approach in deciding procedural due process challenges to civil commitment proceedings. In *Parham* v. *J. R.*, 442 U. S. 584 (1979), for example, we considered a challenge to state procedures for commitment of a minor with parental consent. In determining that *procedural* due process did not mandate an adversarial hearing, we weighed the liberty interest of the individual against the legitimate interests of the State, including the fiscal and administrative burdens additional procedures would entail.[23] *Id.*, at 599–600.

Accordingly, whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests. If there is to be any uniformity in protecting these interests, this balancing cannot be left to the unguided discretion of a judge or jury. We therefore turn to consider the proper standard for determining whether a State adequately has protected the rights of the involuntarily committed mentally retarded.

## B

We think the standard articulated by Chief Judge Seitz affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints. He would have held that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." 644 F. 2d, at 178. Persons who have been involun-

---

the purpose of respondent's commitment was to provide reasonable care and safety, conditions not available to him outside of an institution.

[23] See also *Addington* v. *Texas*, 441 U. S. 418 (1979). In that case, we held that the State must prove the need for commitment by "clear and convincing" evidence. See *id.*, at 431–432. We reached this decision by weighing the individual's liberty interest against the State's legitimate interests in confinement.

tarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. Cf. *Estelle* v. *Gamble*, 429 U. S. 97, 104 (1976). At the same time, this standard is lower than the "compelling" or "substantial" necessity tests the Court of Appeals would require a State to meet to justify use of restraints or conditions of less than absolute safety. We think this requirement would place an undue burden on the administration of institutions such as Pennhurst and also would restrict unnecessarily the exercise of professional judgment as to the needs of residents.

Moreover, we agree that respondent is entitled to minimally adequate training. In this case, the minimally adequate training required by the Constitution is such training as may be reasonable in light of respondent's liberty interests in safety and freedom from unreasonable restraints. In determining what is "reasonable"—in this and in any case presenting a claim for training by a State—we emphasize that courts must show deference to the judgment exercised by a qualified professional. By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized.[29] Moreover, there certainly

---

[29] See *Parham* v. *J. R.*, 442 U. S. 584, 608, n. 16 (1979) (In limiting judicial review of medical decisions made by professionals, "it is incumbent on courts to design procedures that protect the rights of the individual without unduly burdening the legitimate efforts of the states to deal with difficult social problems"). See also *Rhodes* v. *Chapman*, 452 U. S. 337, 352 (1981) ("[C]ourts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system . . ."); *Bell* v. *Wolfish*, 441 U. S. 520, 539 (1979) (In the context of conditions of confinement of pretrial detainees, "[c]ourts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility"); *Wolff* v. *McDonnell*, 418 U. S. 539, 556 (1974) (In considering a pro-

is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions. See *Parham* v. *J. R.*, *supra*, at 607; *Bell* v. *Wolfish*, *supra*, at 544 (Courts should not "'second-guess the expert administrators on matters on which they are better informed'"). For these reasons, the decision, if made by a professional,[30] is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.[31] In an action for damages against a professional in his individual capacity, however, the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability. See n. 13, *supra*.

---

cedural due process claim in the context of prison, "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application"). See also Townsend & Mattson, The Interaction of Law and Special Education: Observing the Emperor's New Clothes, 1 Analysis and Intervention in Developmental Disabilities 75 (1981) (judicial resolution of rights of the handicapped can have adverse as well as positive effects on social change).

[30] By "professional" decisionmaker, we mean a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons.

[31] All members of the Court of Appeals agreed that respondent's expert testimony should have been admitted. This issue was not included in the questions presented for certiorari, and we have no reason to disagree with the view that the evidence was admissible. It may be relevant to whether petitioners' decisions were a substantial departure from the requisite professional judgment. See *supra*, this page.

## IV

In deciding this case, we have weighed those postcommitment interests cognizable as liberty interests under the Due Process Clause of the Fourteenth Amendment against legitimate state interests and in light of the constraints under which most state institutions necessarily operate. We repeat that the State concedes a duty to provide adequate food, shelter, clothing, and medical care. These are the essentials of the care that the State must provide. The State also has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution. And it may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training. In this case, therefore, the State is under a duty to provide respondent with such training as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints. It may well be unreasonable not to provide training when training could significantly reduce the need for restraints or the likelihood of violence.

Respondent thus enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests. Such conditions of confinement would comport fully with the purpose of respondent's commitment. Cf. *Jackson* v. *Indiana*, 406 U. S. 715, 738 (1972); see n. 27, *supra*. In determining whether the State has met its obligations in these respects, decisions made by the appropriate professional are entitled to a presumption of correctness. Such a presumption is necessary to enable institutions of this type—often, unfortunately, overcrowded and understaffed—to continue to function. A single professional may have to make decisions with respect to a number of residents with widely varying needs and problems in the course of a normal day. The administrators, and par-

ticularly professional personnel, should not be required to make each decision in the shadow of an action for damages.

In this case, we conclude that the jury was erroneously instructed on the assumption that the proper standard of liability was that of the Eighth Amendment. We vacate the decision of the Court of Appeals and remand for further proceedings consistent with this decision.

*So ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE O'CONNOR join, concurring.

I join the Court's opinion. I write separately, however, to make clear why I believe that opinion properly leaves unresolved two difficult and important issues.

The first is whether the Commonwealth of Pennsylvania could accept respondent for "care and treatment," as it did under the Pennsylvania Mental Health and Mental Retardation Act of 1966, Pa. Stat. Ann., Tit. 50, § 4406(b) (Purdon 1969), and then constitutionally refuse to provide him any "treatment," as that term is defined by state law. Were that question properly before us, in my view there would be a serious issue whether, as a matter of due process, the State could so refuse. I therefore do not find that issue to be a "frivolous" one, as THE CHIEF JUSTICE does, *post*, at 330, n. [1]

In *Jackson* v. *Indiana*, 406 U. S. 715 (1972), this Court, by a unanimous vote of all participating Justices, suggested a constitutional standard for evaluating the conditions of a civilly committed person's confinement: "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id.*, at 738. Under this standard,

---

[1] See also Garvey, Freedom and Choice in Constitutional Law, 94 Harv. L. Rev. 1756, 1787–1791 (1981); *Welsch* v. *Likins*, 550 F. 2d 1122, 1126, and n. 6 (CA8 1977); *Wyatt* v. *Aderholt*, 503 F. 2d 1305 (CA5 1974), aff'g *Wyatt* v. *Stickney*, 325 F. Supp. 781, 785 (MD Ala. 1971).

a State could accept a person for "safekeeping," then constitutionally refuse to provide him treatment. In such a case, commitment without treatment would bear a reasonable relation to the goal for which the person was confined.

If a state court orders a mentally retarded person committed for "care *and* treatment," however, I believe that due process might well bind the State to ensure that the conditions of his commitment bear some reasonable relation to each of those goals. In such a case, commitment without any "treatment" whatsoever would not bear a reasonable relation to the purposes of the person's confinement.

In respondent's case, the majority and principal concurring opinions in the Court of Appeals agreed that "[b]y basing [respondent's] deprivation of liberty at least partially upon a promise of treatment, the state ineluctably has committed the community's resources to providing minimal treatment." 644 F. 2d 147, 168 (CA3 1980).[2] Neither opinion clarified, however, whether respondent in fact had been totally denied "treatment," as that term is defined under Pennsylvania law. To the extent that the majority addressed the question, it found that "the evidence in the record, although somewhat contradictory, suggests not so much a total failure to treat as an inadequacy of treatment." *Ibid.*

This Court's reading of the record, *ante,* at 311–312, and n. 7, supports that conclusion. Moreover, the Court today finds that respondent's entitlement to "treatment" under Pennsylvania law was not properly raised below. See *ante,*

---

[2] In the principal concurring opinion, Chief Judge Seitz, for himself and three other judges, stated:

"The state does not contest that it has placed the [respondent] in Pennhurst to provide basic care and treatment. Indeed, he has a right to treatment under state law, . . . and the fact that Pennhurst has programs and staff to treat patients is indicative of such a purpose. I believe that when the purpose of confining a mentally retarded person is to provide care and treatment, as is undoubtedly the case here, it violates the due process clause to fail to fulfill that purpose." 644 F. 2d, at 176.

at 316, n. 19. Given this uncertainty in the record, I am in accord with the Court's decision not to address the constitutionality of a State's total failure to provide "treatment" to an individual committed under state law for "care and treatment."

The second difficult question left open today is whether respondent has an independent constitutional claim, grounded in the Due Process Clause of the Fourteenth Amendment, to that "habilitation" or training necessary to *preserve* those basic self-care skills he possessed when he first entered Pennhurst—for example, the ability to dress himself and care for his personal hygiene. In my view, it would be consistent with the Court's reasoning today to include within the "minimally adequate training required by the Constitution," *ante*, at 322, such training as is reasonably necessary to prevent a person's pre-existing self-care skills from *deteriorating* because of his commitment.

The Court makes clear, *ante*, at 315–316 and 324, that even after a person is committed to a state institution, he is entitled to such training as is necessary to prevent unreasonable losses of additional liberty as a result of his confinement—for example, unreasonable bodily restraints or unsafe institutional conditions. If a person could demonstrate that he entered a state institution with minimal self-care skills, but lost those skills after commitment because of the State's unreasonable refusal to provide him training, then, it seems to me, he has alleged a loss of liberty quite distinct from—and as serious as—the loss of safety and freedom from unreasonable restraints. For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they ever will know.

Although respondent asserts a claim of this kind, I agree with the Court that "[o]n the basis of the record before us, it is quite uncertain whether respondent [in fact] seeks any

'habilitation' or training unrelated to safety and freedom from bodily restraints."[3]  *Ante*, at 318.  Since the Court finds respondent constitutionally entitled at least to "such training as may be reasonable in light of [his] liberty interests in safety and freedom from unreasonable restraints," *ante*, at 322, I accept its decision not to address respondent's additional claim.

If respondent actually seeks habilitation in self-care skills not merely to reduce his aggressive tendencies, but also to maintain those basic self-care skills necessary to his personal autonomy within Pennhurst, I believe he is free on remand to assert that claim.  Like the Court, I would be willing to defer to the judgment of professionals as to whether or not, and to what extent, institutional training would preserve re-

---

[3] At trial, respondent's attorney requested a jury instruction that

"[u]nder the Eighth and Fourteenth Amendments, state officials at a state mental hospital have a duty to provide residents of such institutions with such treatment as will afford them a reasonable opportunity to acquire *and maintain* those life skills necessary to cope as effectively as their capacities permit."  App. to Pet. for Cert. 94a–95a (emphasis added).

In this Court, respondent again argued that

"without minimal habilitative efforts—basic training in fundamental life skills—institutionalized retarded persons not only will fail to develop such skills independently *but also will lose the skills they may have brought with them into the institution.* . . . Indeed, putting aside increased risks of physical harm, if a retarded individual loses all of his previously acquired skills through prolonged institutional neglect, then the State has worked positive injury . . . .  Once [retarded persons] have been confined they have no one but the State to turn to for help in gaining additional skills or, *at least, preserving whatever skills and abilities they have.*"  Brief for Respondent 22–23 (emphasis added).

Respondent's description of the expert testimony to be offered on remand, however, suggests that he seeks training in self-care skills primarily to ensure his personal safety and the safety of others.  See, *e. g.*, App. to Pet. for Cert. 100a (respondent's offer of proof that "when mentally retarded individuals learn alternative behavior, such as toilet training and dressing and so forth, [their] aggression decreases"); Brief for Respondent 22 (training in self-care skills is necessary to prevent development of "a variety of inappropriate, aggressive and self-destructive behaviors").

spondent's pre-existing skills. Cf. *ante*, at 321–323. As the Court properly notes, "[p]rofessionals in the habilitation of the mentally retarded disagree strongly on the question whether effective training of all severely or profoundly retarded individuals is even possible." *Ante*, at 316, n. 20.

If expert testimony reveals that respondent was so retarded when he entered the institution that he had no basic self-care skills to preserve, or that institutional training would not have preserved whatever skills he did have, then I would agree that he suffered no additional loss of liberty even if petitioners failed to provide him training. But if the testimony establishes that respondent possessed certain basic self-care skills when he entered the institution, and was sufficiently educable that he could have maintained those skills with a certain degree of training, then I would be prepared to listen seriously to an argument that petitioners were constitutionally required to provide that training, even if respondent's safety and mobility were not imminently threatened by their failure to do so.

The Court finds it premature to resolve this constitutional question on this less than fully developed record. Because I agree with that conclusion, I concur in the Court's opinion.

CHIEF JUSTICE BURGER, concurring in the judgment.

I agree with much of the Court's opinion. However, I would hold flatly that respondent has no constitutional right to training, or "habilitation," *per se.* The parties, and the Court, acknowledge that respondent cannot function outside the state institution, even with the assistance of relatives. Indeed, even now neither respondent nor his family seeks his discharge from state care. Under these circumstances, the State's provision of food, shelter, medical care, and living conditions as safe as the inherent nature of the institutional environment reasonably allows, serves to justify the State's custody of respondent. The State did not seek custody of respondent; his family understandably sought the State's aid to meet a serious need.

I agree with the Court that some amount of self-care instruction may be necessary to avoid unreasonable infringement of a mentally retarded person's interests in safety and freedom from restraint; but it seems clear to me that the Constitution does not otherwise place an affirmative duty on the State to provide any particular kind of training or habilitation—even such as might be encompassed under the essentially standardless rubric "minimally adequate training," to which the Court refers. See *ante*, at 319, and n. 24. Cf. 644 F. 2d 147, 176 (CA3 1980) (Seitz, C. J., concurring in judgment). Since respondent asserts a right to "minimally adequate" habilitation "[q]uite apart from its relationship to decent care," Brief for Respondent 23, unlike the Court I see no way to avoid the issue.* Cf. *ante*, at 318.

I also point out that, under the Court's own standards, it is largely irrelevant whether respondent's experts were of the opinion that "additional training programs, including self-care programs, were needed to reduce [respondent's] aggressive behavior," *ibid.*—a prescription far easier for "spectators" to give than for an institution to implement. The training program devised for respondent by petitioners and other professionals at Pennhurst was, according to the Court's opinion, "presumptively valid"; and "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judg-

---

*Indeed, in the trial court respondent asserted a broad claim to such "treatment as [would] afford [him] a reasonable opportunity to acquire and maintain those life skills necessary to cope as effectively as [his] capacities permit." App. to Pet. for Cert. 94a.

Respondent also maintains that, because state law purportedly creates a right to "care and treatment," he has a *federal substantive* right under the Due Process Clause to enforcement of this state right. See *ante*, at 316, n. 19. This contention is obviously frivolous; were every substantive right created by state law enforceable under the Due Process Clause, the distinction between state and federal law would quickly be obliterated.

ment." *Ante*, at 323. Thus, even if respondent could demonstrate that the training programs at Pennhurst were inconsistent with generally accepted or prevailing professional practice—if indeed there be such—this would not avail him so long as his training regimen was actually prescribed by the institution's professional staff.

Finally, it is worth noting that the District Court's instructions in this case were on the whole consistent with the Court's opinion today; indeed, some instructions may have been overly generous to respondent. Although the District Court erred in giving an instruction incorporating an Eighth Amendment "deliberate indifference" standard, the court also instructed, for example, that petitioners could be held liable if they "were aware of and failed to take all reasonable steps to prevent repeated attacks upon" respondent. See *ante*, at 312. Certainly if petitioners took "*all* reasonable steps" to prevent attacks on respondent, they cannot be said to have deprived him either of reasonably safe conditions or of training necessary to achieve reasonable safety.