William **KIRSCH**

v.

Ford **THOMPSON, et al.**

Civ. A. No. 87–7570.

United States District Court,
E.D. Pennsylvania.

March 9, 1988.

---

Stephen F. Gold, Philadelphia, Pa., for plaintiff.

Carl Vacarro, Deputy Atty. Gen., Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

JAMES McGIRR KELLY, District Judge.

Plaintiff, William Kirsch, a patient at Philadelphia State Hospital (PSH) has filed a complaint with this court against defendants, Ford Thompson, Charles Erb, John White and John Does, alleging that his treatment at PSH or lack thereof has violated his rights under the Fourteenth Amendment to the United States Constitution.[1] Complaint at 6. More specifically, plaintiff alleges that

> [f]or at least the past fourteen months, for twenty-four hours a day, his wrists and ankles have been shackled, bound, restricted and immobilized. He has been involuntarily placed in four-point restraints. In fact, he has been in five-point shackles—with a locked strap around his chest, preventing any movement. For some of those fourteen months, he was restrained in bed for twenty-four hours a day.

Complaint at ¶ 10.

Presently before this court is plaintiff's motion for a preliminary and/or permanent injunction [2] ordering defendants to: (1) provide funding to the City of Philadelphia to permit the City Office of Mental Health and Mental Retardation to locate and operate an appropriate Philadelphia Community Living Arrangement (CLA).[3] This funding

---

1. Ford Thompson is the acting superintendent of PSH. Complaint at ¶ 9. Charles Erb is the former superintendent of PSH. *Id.* at ¶ 10. John Does are unnamed employees of PSH. *Id.* at ¶ 11. John White is the Secretary of the Pennsylvania Department of Public Welfare. *Id.* at ¶ 12. The claims against these defendants "are authorized by 28 U.S.C. §§ 2201 and 2202, and arise under 42 U.S.C. § 1983." Complaint at ¶ 7.

2. By agreement of counsel the motions for preliminary injunction and permanent injunction were consolidated for purposes of an evidentiary hearing.

3. A Community Living Arrangement (CLA) is "a small residential group composed of mentally retarded people who function at similar levels. These individuals live in a house within the community and receive intensive supervision and training in their behaviors and skills necessary to function independently within the com-

shall be provided by the defendants in the form of a direct line item allocation to the City which will not replace other funds already provided to the City; (2) immediately transfer plaintiff to the Polk Center and enroll him in Polk's intensive behavioral program for retarded persons until the CLA is ready for plaintiff, but for no longer than six months; (3) provide the City with funding to hire a consultant to assist the City in developing plaintiff's behavioral program in the CLA; and (4) provide plaintiff's counsel copies of all baseline data, behavioral programs, and statistical information concerning plaintiff's progress at Polk.

Defendants argue that this motion should be denied since: (1) plaintiff has failed to show that the treatment and training decisions concerning plaintiff were a substantial departure from accepted professional judgment constituting a violation of his substantive due process rights; (2) since plaintiff has failed to present evidence which would establish under the standards promulgated in *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) that named defendants as supervisory officials violated his constitutional rights; and (3) the monetary, and injunctive relief sought by plaintiff is not permissible and is barred by the Eleventh Amendment.

An evidentiary hearing on plaintiff's motion for injunctive relief was held before this court. Both sides have submitted proposed findings of fact and conclusions of law. In accordance with Federal Rule of Civil Procedure 52(a) the following are this court's findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff William Kirsch is a twenty-seven year old male who is presently involuntarily committed at PSH.

2. Plaintiff first entered PSH in June, 1980, when he was nineteen years old.

3. At the time of his admittance to PSH plaintiff was diagnosed as mildly to moder-

ately mentally retarded. (Defendant's Exhibit 3.)

4. At the time of his admittance to PSH plaintiff was in four point physical restraints. (Defendant's Exhibit 1.)

5. Prior to his admittance to PSH plaintiff had occasionally punched and kicked himself and others without provocation. *Id.*

6. During his first two years at PSH plaintiff was capable of and permitted to leave PSH by himself to visit his father. (Plaintiff's Exhibit 4.)

7. During his first two years at PSH plaintiff, because he was responding to therapy, was given ground privileges to further support his recovery. (Plaintiff's Exhibit 4.)

8. In August 1981 plaintiff was examined by a PSH doctor and diagnosed as mentally retarded but not psychotic. Plaintiff was also found to be competent and capable of managing his financial affairs. (Plaintiff's Exhibit 5.)

9. In November 1984 plaintiff was examined by a PSH doctor who found that plaintiff had no disturbance of memory but did suffer from moderate disturbances of emotional tone and judgment. Plaintiff, however, was found to be competent and capable of managing his financial affairs. (Plaintiff's Exhibit 6.)

10. In September 1985 plaintiff, due to his continued unprovoked striking, was transferred to the Assaultive Management Program at Norristown State Hospital (NSH). (Plaintiff's Exhibit 12.)

11. The Assaultive Management Program at NHS is a small unit which utilizes a variety of behavior therapies designed to treat highly assaultive patients.

12. In September, 1986 plaintiff was transferred back to PSH.

13. In October, 1986 plaintiff was examined by Dr. Resnick, a PSH doctor. Dr. Resnick found that plaintiff suffered from mild memory loss and severe disturbances of judgment and emotional tone. Dr. Resnick also found that plaintiff was incapable

munity." *Clark v. Cohen*, 613 F.Supp. 684, 687 (D.C.Pa.1985).

of managing his financial affairs and concluded that plaintiff was incompetent. (Plaintiff's Exhibit 9.)

14. During the past few years plaintiff has suffered numerous physical injuries. His teeth have been chipped, he has smashed his head through a glass window, smashed both of his hands through a wired window, and he regularly has scabs and bruises on his wrists and ankles.

15. Since January, 1987 plaintiff has fractured his right humorous, fifth toe on his left foot and fifth toe on his right foot. (Plaintiff's Exhibit 15.)

16. For approximately the last three years, plaintiff has been in four point physical restraints. (Plaintiff's Exhibit 1.)

17. The physical restraints plaintiff has been placed in inadvertently have become reinforcing for him. The restraints have become a source of security for plaintiff. (Plaintiff's Exhibit 16.)

18. Plaintiff wants to be placed in the restraints and when they are removed, he becomes agitated. *Id.*

19. Plaintiff's condition has deteriorated during his years at PSH and he has not benefited from his stay at the Assaultive Management Program at NSH.

20. The environment at PSH and the programs there have caused regression and intensified plaintiff's assaultive behavior.

## CONCLUSIONS OF LAW

■ 1. An individual involuntarily committed to a state institution maintains liberty interests protected substantially by the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

■ 2. These liberty interests include the right to safe conditions of confinement and the right to be free from bodily restraint. *Id.* at 315–16, 102 S.Ct. at 2457–58.

3. In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court set forth the proper balance between the interests of the State and the rights of the involuntarily commit-

ted to reasonable conditions of safety and freedom from unreasonable restraints.

■ 4. An individual who is being physically restrained has a substantive due process right to "such training as an appropriate professional would consider reasonable to ensure [the patient's] safety and to facilitate his ability to function free from bodily restraints." *Id.* at 324, 102 S.Ct. at 2462.

5. The Court defined professional decisionmaker as:

> a person competent whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded.

*Id.* at 323, n. 30, 102 S.Ct. at 2462, n. 30.

6. The decision of the professional "has to be one based on medical or psychological criteria and not an exigency, administrative convenience, or other non-medical criteria." *Clark v. Cohen*, 613 F.Supp. 684, 704 (D.C. Pa.1985); *aff'd* 794 F.2d 79 (3d Cir.1986); *cert. denied*, 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986).

■ 7. Plaintiff's treatment program at PSH was/is professionally unacceptable for a person with a retardation and assaultive behavior in that it inadvertently rewards plaintiff's assaultive behavior.

8. Professionally acceptable programs do exist to reduce or eliminate assaultive behavior similar to plaintiff's, in persons with a dual diagnosis of retardation and assaultive behavior.

9. A professionally acceptable situation for plaintiff would be to place him in a community living arrangement while he undergoes an appropriate behavior modification program.

10. Plaintiff, William Kirsch, has not received the training that an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints.

11. Plaintiff, therefore, has been deprived of the substantive rights guaranteed to him under the due process clause of the Fourteenth Amendment to the United States Constitution.

An Order follows.

ORDER

AND NOW, this 9th day of March, 1988, upon consideration of plaintiff's motion for a preliminary and/or a permanent injunction, and defendants' response thereto, and after a hearing thereon, and upon the representation of the City of Philadelphia that it will take responsibility to provide appropriate residential and behavioral services to plaintiff, if funding for such services is provided,

IT IS ORDERED that:

1. Defendants shall forthwith provide sufficient direct funding to the City of Philadelphia to permit the City Office of Mental Health and Mental Retardation to locate and operate an appropriate Philadelphia Community Living Arrangement (CLA) with necessary supportive services for plaintiff in accordance with the tentative funding plan proposed by City officials at the hearing on this matter. Such funding shall be provided by the defendants to the City in the form of a direct line item allocation to the City, which will not replace or supplant other funds already provided to the City.

2. Because the creation of the Philadelphia CLA placement for plaintiff will take from four to six months, and because plaintiff's current placement at Philadelphia State Hospital is inappropriate, the defendants shall transfer plaintiff from Philadelphia State Hospital to the Polk Center and enroll him in Polks' intensive behavioral program for retarded persons. At Polk he will there be provided a professionally designed behavioral program to reduce plaintiff's aggressions and reduce his current level of medications and restraint;

3. The transfer to Polk will occur within ten days of the date of this order, and will last no longer than six (6) months, at which time plaintiff will be transferred to the CLA placement created by the City of Philadelphia and funded by the Commonwealth of Pennsylvania pursuant to Paragraph 1 above;

4. The transfer of plaintiff from Polk to a Philadelphia CLA will occur sooner than in six months if the CLA is ready, and if in the opinion of plaintiff's treatment team at Polk and his Philadelphia casemanager, such a placement is clinically appropriate.

5. Under no circumstances will the transfer from Polk to a Philadelphia CLA occur later that six months from the date of this Order without the written agreement of plaintiff's counsel or Order of this Court.

6. Defendants shall, in addition to the above, forthwith provide the City with sufficient funding to hire, as a consultant, Richard Foxx, Ph.D. for consultation for six days at his normal consultation rate, plus expenses.

7. Dr. Foxx will visit with plaintiff at Polk for the purpose of assisting the City in development of plaintiff's behavioral program in the CLA, and will assist in aiding the transition from Polk's program to the City's.

8. The defendants shall provide to the City Office of Mental Retardation and plaintiff's counsel copies of all baseline data, behavioral programs, and statistical information concerning plaintiff's progress at Polk on a weekly basis.