**JASPER COUNTY, Appellant,**

v.

**Brad McCALL, Judicial Hospitalization Referee, Appellee,**

**Robert Roll, Intervenor.**

No. 86–1585.

Supreme Court of Iowa.

March 16, 1988.

Douglas F. Staskal and James E. Brick, Des Moines, for appellant.

Brad McCall, Newton, pro se.

Richard E.H. Phelps II, Newton, for intervenor.

Considered by McGIVERIN, C.J., and HARRIS, CARTER, NEUMAN and ANDREASEN, JJ.

HARRIS, Justice.

Robert Roll is a resident of Jasper County who has been a deaf mute since birth. He suffers from a serious mental impairment which, according to the finding of the judicial hospitalization referee, requires highly specialized and expensive treatment which is available only outside Iowa. The questions here have to do with what care can be ordered for Roll and whether the

public is required to pay for it. The district court found authority for the referee to order special treatment for Roll at county expense. We affirm.

The application seeking Roll's involuntary hospitalization alleged serious mental impairment as that term is defined in Iowa Code section 229.1(2).[1] Roll is thirty-two years old and has spent the majority of his life in institutions. Sometimes his commitments have been voluntary; sometimes they have been involuntary. For the six months preceding the application in question he had undertaken inpatient treatment at the Deaf Treatment Center, a facility operated by the state of Wisconsin at the Mendota Mental Health Institute, Madison, Wisconsin [Mendota].

Pursuant to a stipulation which contemplated a voluntary placement, Roll was placed in the Jasper County care facility where he remained from March 18, 1985, until August 4, 1985. On that date a request for emergency hospitalization was filed with the defendant, the judicial hospitalization referee in Jasper County. Two days later an application for hospitalization was filed, alleging Roll had struck several staff members at the facility and that the facility could no longer care for him. Following a recommendation by Roll's treating physician and another physician (appointed to evaluate Roll pursuant to Iowa Code section 229.8(3)(b)), the parties stipulated to place Roll again at Mendota. Before the transfer took place the Jasper County attorney requested alternative placement, alleging that the expense of placing Roll at Mendota would be too great.

Experts concluded that Roll suffered from a mixed personality disorder and recommended placement "in a group living facility where all of the staff and contact personnel would be fluent in ASL (American sign language)." They advised that Roll not be placed in a "mental institution."

Various alternative placements were considered or attempted but proved unsuccessful. A stipulation for placement at Woodward state hospital was to no avail due to lack of space. The referee then ordered

Roll placed at the Jasper County facility pending a possible placement in a residential facility in Des Moines. But a solution proved always to be elusive and the reason seems obvious. Roll's treating physician stated that Roll suffered from a variety of mental disorders and had a potential for explosive behavior. As a result he was likely to injure himself or others unless he got treatment.

Following another application for hospitalization filed by staff members at the Jasper County facility, alleging that Roll had slapped another resident and had assaulted a staff member, the referee held another hearing on April 22, 1986. The administrator of the facility and two other staff members urged that Roll was not an appropriate resident for that facility because they could not use locked rooms and because the staff had little training in handling residents with severe behavioral problems. Roll's treating physician testified that Roll's best interests dictated placement in a facility suited to the treatment of mentally ill deaf persons. The doctor thought that, because Iowa has no such facility, the Jasper County facility was the most appropriate institution in Iowa. The referee thus ordered that Roll return to the Jasper County facility until bed space became available at a residential facility.

Another assault by Roll on a facility staff member led to still another application which resulted in hospitalization which lasted until Roll's doctor advised the referee that Roll could safely be returned to the Jasper County facility. This time when the referee ordered Roll's continued placement at the facility, the facility filed for a writ of certiorari to challenge the order of placement.

A temporary injunction was entered in district court restraining the hospitalization referee, or anyone else, from placing Roll at the facility. Following a hearing, the referee ordered that Roll be placed at Mendota and assessed the costs of Roll's treatment to Jasper County.

1. All references are to the 1985 Iowa Code.

Jasper County amended its petition for writ, alleging that the referee lacked authority to order placement in an out-of-state facility. Even if such authority existed, Jasper County challenged the assessment of costs against the county. Roll intervened. Following a hearing the district court dismissed the petition, finding that the referee's orders were a proper exercise of the jurisdiction conferred upon him by Iowa Code section 229.21. Roll was then transported to Mendota for treatment.

I. Appeal to the supreme court lies from a judgment of the district court in a certiorari proceeding, and will be governed by the rules applicable in ordinary actions. Iowa R.Civ.P. 318. Our review is for correction of errors at law. *Chariton Feed & Grain, Inc. v. Harder,* 369 N.W.2d 777, 782 (Iowa 1985); Iowa R.App.P. 4.

■ II. Iowa Code sections 229.13 and 229.21 vest the referee with the power to place impaired persons in a hospital or other suitable facility. The provisions are silent on whether the authority extends to placements outside Iowa but we agree with the referee that his authority must be so interpreted.

The county's reading of the statutes, limiting placement to an area where adequate treatment has been found unavailable, would be of highly doubtful constitutionality. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the court defined the fourteenth amendment substantive rights of involuntarily committed mentally retarded persons. The court concluded that the individual's liberty interests require that the state provide "minimally adequate or reasonable" treatment. *Id.* at 319, 102 S.Ct. at 2460, 73 L.Ed.2d at 39. Several courts have also held that state officials must provide the least stringent practicable alternatives to confinement of noncriminals. *See Stamus v. Leonhardt,* 414 F.Supp. 439 (S.D.Iowa 1976); *see also Eubanks v. Clarke,* 434 F.Supp. 1022 (E.D.Pa.1977); *Davis v. Watkins,* 384 F.Supp. 1196 (N.D.Ohio 1974); *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972).

Iowa Code section 229.13 states that a person found to be mentally impaired shall be placed "in a hospital or other suitable facility." Section 229.14 requires the facility's chief medical officer to recommend "an alternative placement" upon finding that the mentally impaired person is unlikely to benefit from further treatment in a hospital. Nowhere in chapter 229 is either "other suitable facility" or "alternative placement" defined.

Section 229.23 seems to expressly recognize the minimum requirements defined in *Youngberg v. Romeo.* The statute states that a person shall have the right to "care and treatment as indicated by sound medical practice."

We hold that the placement authority of a hospitalization referee under sections 229.13 and 229.21 is not necessarily confined to facilities in Iowa. Placement can be ordered elsewhere when adequate treatment cannot be found within Iowa's boundaries. We think it follows that the placement can be ordered at public expense under the same terms and conditions as would be appropriate for placements in Iowa.

A caveat is in order. The scope of this holding is limited in two important ways. It applies only to situations where adequate minimum treatment is not available in Iowa. Secondly, out of concern for the beleaguered taxpayers, out-of-state placements should be ordered only where realistically needed and should not be ordered for the routine care of persons, even those with tragically difficult problems who might be happier or more comfortable elsewhere.

■ All of the evidence here indicated that facilities found in Iowa were not staffed with persons experienced in sign language. They were not trained to treat persons who suffer from Roll's condition. They could not provide minimally adequate or reasonable treatment for Roll. It thus appears that the referee was authorized to order that Roll be placed in an out-of-state facility capable of treating him.

III. The county also challenges the authority of the referee to order the county care facility to accept a severely mentally ill person over the objections of the facili-

ty's administrator. Because the question may recur after remand we think it is appropriate for us to address it.

The Jasper County facility was obviously not intended or geared for persons such as Roll. It could not use locked doors and its staff had little training for dealing with persons with severe behavioral problems. On the other hand Roll's condition demanded placement somewhere until a suitable facility could be found.

Iowa Code section 229.1(11) defines "chief medical officer" as the one in charge of any public or private hospital. The section then subordinates the authority of that officer to the superintendent in matters "regarding the appropriateness of admissions or discharges of patients...." But the statute then provides "it is the intent of this chapter that if the superintendent is not a licensed physician the superintendent shall be guided in these decisions by the chief medical officer of that hospital."

 This provision, granting authority in matters of admission to superintendents, sets its own boundaries. In cases where, as here, the superintendent is not a physician, the superintendent's admission decision must conform with the views of the chief medical officer. This facility had no such officer. We are thus left with a situation which falls outside the framework of a statute. Roll's treating physician was employed by the Jasper County facility, but not as chief medical officer. He advised the referee that placement was appropriate. The superintendent felt it was not. But he was not a physician and had no chief medical officer to guide him.

Guidelines set up within the parameters of the superintendent's statutory authority cast some light beyond it. We think the legislature intended for superintendents who are not physicians to yield in their admission determinations to the opinion of a physician. In the confrontation here the physician's opinion was that admission was appropriate. Under the circumstances the referee was authorized to direct admission without obtaining approval of the superintendent.

AFFIRMED.