782 F.Supp. 502 (1991)
UNITED STATES of America, Plaintiff,
Sonya Fryer, et al., Plaintiff-Intervenors,
v.
STATE OF OREGON, et al., Defendants,
Oregonian Publishing Company, an Oregon corporation, Third-Party Intervenor.
Civ. No. 86-961-MA.
United States District Court, D. Oregon.
October 22, 1991.
Robinsue Frohboese, Cynthia L. Katz, Gayle D. Fidler, U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., Jack G. Collins, Chief, Civil Div., Asst. U.S. Atty., Portland, Or., for plaintiff U.S.
Robert C. Joondeph, Portland, Or., for plaintiff-intervenors.
Dave Frohnmayer, Atty. Gen., Pamela L. Abernethy, Sp. Counsel to Atty. Gen., Oregon Dept. of Justice, Diane L. Brissenden, Asst. Atty. Gen., Thomas K. Elden, Asst. Atty. Gen., Dept. of Justice, Salem, Or., for defendant State of Or.
Charles Hinkle, Stoel Rives Boley Jones & Grey, Portland, Or., for Oregonian Pub. Co.

OPINION
MARSH, District Judge.
On June 12, 1991, plaintiff filed a motion for contempt alleging that defendants violated the April 14, 1989 Consent Decree and the September 20, 1990 order of this court. Plaintiff argued that the relief provided in the Consent Decree was inadequate *503 in light of defendants' historical failure to fully adhere to the terms of the decree. Plaintiff sought an order modifying the decree to the extent that it would direct defendants to reduce the population of Fairview Training Center and to modify and increase expert assessment and Panel monitoring at state expense. Oral argument on this motion was scheduled for Sept. 13, 1991.
On July 31, 1991, shortly after plaintiff filed its motion for contempt but before oral argument, the Advisory Panel issued a report in response to my order of March 5, 1991, and the U.S. emergency motion filed on October 23, 1990.
At the contempt hearing on September 13, 1991, I denied plaintiff's motion for contempt, made oral factual findings based upon the parties' evidentiary submissions, and held that defendants had taken all reasonable steps to comply with the goal of protecting residents from harm. In making this determination, I expressly rejected any proposal which would modify the terms of the Consent Decree. In addition, I directed the parties to work together to devise an agreed upon set of professional standards to be applied to each professional field within Fairview. I explained that these standards should be designed to augment and further refine any terms within the consent decree that are broad, ambiguous, or capable of several interpretations.[1]
As noted by both parties and the court during the hearing on September 13, 1991, the issues raised by plaintiff's motion for contempt and the areas addressed by the Panel in its Report of July 31, 1991 crossed over to a significant extent.[2] Following the hearing, plaintiff submitted a proposed form of order adopting the July 31, 1991 Advisory Panel Report and directing that the Panel's recommendation regarding a revised monitoring and "reporting structure" be implemented. Plaintiff further proposed that defendants' progress should be monitored by utilizing Fairview's own plans and policies. In their response, defendants agree that monitoring should proceed by reference to Fairview plans and policies. However, defendants contend that I should not adopt many of the Panel's factual findings or recommendation for a revised monitoring and reporting structure because they conflict with the factual findings and conclusions I made on September 13, 1991. In light of the significant crossover of issues and in response to requests from the parties, the following constitutes my written findings and conclusions to supplement and clarify my previous oral findings and conclusions relative to defendants' compliance with the Consent Decree as raised by plaintiff's motion for contempt and the July 31, 1991 Advisory Panel Report.

BACKGROUND[3]
The United States filed this action on July 28, 1986, alleging that defendants have engaged in a pattern or practice of depriving mentally retarded and developmentally disabled residents of Fairview Training Center of rights guaranteed under the United States Constitution, under the Civil Rights of Institutionalized Persons Act of 1980 (CRIPA) (42 U.S.C. §§ 1997 through 1997j), and the Education of the Handicapped Children Act (EHA), 20 U.S.C. §§ 1401, et seq. Specifically, plaintiff sought to prove that defendants failed to provide Fairview residents with the following:
*504 (1) adequate training to protect them from bodily injury and unreasonable use of bodily restraints;
(2) adequate medical and health care;
(3) protection from unreasonable risks of harm;
(4) adequate numbers of sufficiently trained staff to render and implement professional judgments regarding necessary care, medical treatment and training; and
(5) services guaranteed by the EHA to all children under the age of twenty-one.
In 1987 defendants filed a counterclaim seeking declaratory and injunctive relief regarding rights to receive medicaid funding. On April 17, 1987 the Health Care Financing Administration (HCFA) terminated Medicaid funding to Fairview based upon defendants' non-compliance with HCFA standards. On July 31, 1987, I issued a preliminary injunction enjoining the U.S. Department of Justice from requiring that the HCFA adopt "constitutional standards" for immediate care facilities. 675 F.Supp. 1249. On that same day, HCFA recertified Fairview for medicaid funding. On October 2, 1987, based upon the restoration of benefits, I granted plaintiff's motion to dismiss defendants' counterclaim finding the issue moot.
After this action was instituted by the federal government, a group of Fairview residents, represented by their parents and guardians, filed a motion to intervene contending that conditions at Fairview violated their due process and equal protection rights. Intervenors also alleged that the conditions at Fairview violated Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 720 and 794), Title XIX of the Social Security Act (42 U.S.C. §§ 1396 and 1396a) and the Education of the Handicapped Act (20 U.S.C. § 1401). The court denied intervention. On February 19, 1988 the Ninth Circuit reversed and remanded. 839 F.2d 635. The court found that the government could not adequately protect the proposed intervenors' interests in light of their differing views concerning the nature and scope of remedial relief and the likelihood that the litigation might impair intervenors' rights to obtain other effective remedies in later litigation.
Thereafter, defendants filed a motion to partially dismiss intervenors' claims. On March 3, 1989, I held that the Due Process Clause does not guarantee intervenors a right to community placement and that there is no "generalized due process right to habilitation in the least restrictive environment." Opinion at 5-7. I further noted that in order to establish a due process violation, intervenors would have to show that the residents' living conditions constituted "a substantial departure from accepted professional judgment or standards." Opinion at 7. My opinion was based largely upon the Supreme Court's decision in Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Therefore, because intervenors' claim rested solely upon the assertion that community treatment is preferable to institutionalization, I granted defendants' motion to dismiss this claim for relief. Opinion at 9. In addition, I held that intervenors had failed to state a claim under the Equal Protection Clause. Opinion at 13. Finally, I held that intervenors had a cognizable claim for training to maintain self-care skills, but not to develop such skills, and that § 1983 afforded a private right of action to enforce the procedural guarantees of Title XIX. Opinion at 16-20.[4]
On April 5, 1989, I granted plaintiff-intervenors' motion for class certification. The certified class consists of "all persons who have resided at Fairview since October 2, 1986, or will in the future reside there," and a subclass consisting of members of the class who requested and were denied community services on the basis of the severity of their handicaps, physical handicaps *505 or their maladaptive behaviors in violation of § 504 of the Rehabilitation Act.[5]
On April 14, 1989, I approved a Consent Decree proposed by the plaintiff and state defendants.[6] The decree, which is divided into ten sections and includes an "Attachment List" of over 200 specific items to be addressed in the plan, required that defendants design a plan within 60 days of the entry of the decree, which was to be "fully implemented" by June 30, 1991. The decree also sets forth nineteen items which the plan must address including staffing ratios, qualifications and supervision; resident evaluation, treatment and training; and facility record keeping and administrative procedures. Compliance with the plan is to be monitored by the United States.
In addition, defendants agreed to adopt the following five "priority measures" immediately upon entry of the decree: (1) implementation of appropriate training programs for residents exhibiting life threatening pica behavior, frequent self-injurious conduct or frequent aggressive conduct; (2) deployment of 1:1 staffing where necessary according to professional judgment to protect residents from unreasonable risks of injury; (3) professional evaluation and steps to reduce or eliminate risks to residents due to aspiration or seizures; (4) professional evaluation of residents receiving psychotropic or anticonvulsant medication and implementation of necessary changes; and (5) insuring that medical emergencies are timely and adequately addressed.
Finally, the decree also provided for the formation of a three person advisory panel to resolve any disputes between the parties concerning provisions of the plan and compliance therewith. All decisions of the advisory panel are subject to judicial review, and thus, the decree contemplated that this court would retain ongoing jurisdiction.
On March 1, 1990, the Advisory Panel issued a report in which it found that the state failed to take sufficient steps toward improvement and set a time line for implementation of remedial measures. On April 23, 1990 the plaintiff's experts toured the facilities and found evidence of defendants' non-compliance with the plan, particularly regarding the protection of residents.
On June 8, 1990, plaintiff filed an emergency motion seeking remedies for non-compliance with the objectives and priority measures of the consent decree. Plaintiff alleged three areas of non-compliance: (1) failure to develop and implement professionally designed training programs for all residents who have life threatening, pica and other injurious behaviors; (2) failure to provide qualified 1:1 staffing when necessary; and (3) failure to protect residents from unreasonable risks to their personal safety. On June 22, 1990 I held the plaintiff's motion in abeyance and referred the matter to the Advisory Panel.
The Panel toured Fairview from June 30-July 2, 1990. It reported initial observations and urged the parties to resolve the issues by stipulation. This attempt continued through July 27, 1990, and was ultimately unsuccessful because the parties were unable to resolve differences regarding the magnitude of the problems and an appropriate resolution. On August 3, 1990 the Panel issued a report and found that defendants failed to comply with consent decree by taking inadequate steps to protect residents from injury. The Panel found evidence of persistent risks to the personal safety of residents as evidenced by injuries and other serious incidents. The Panel further found that although progress had been made, continuing problems *506 were attributable to the following systemic defects:
1) behavioral prescriptions were not sufficiently individualized;
2) programs lacked current level of sophistication and knowledge;
3) direct care staff had insufficient familiarity with residents and their prescriptions;
4) programs were not being implemented on a consistent basis;
5) data was inconsistently recorded;
6) residents engaged in serious behaviors while under supervision of staff who were inattentive or distracted by other residents or events; and
7) 1:1 staff had insufficient orientation prior to working with residents.
I adopted the Panel's recommendations and its proposed time line in my order of September 20, 1990, noting however, that the recent failings were a result of "a fragmented attempt to satisfy individualized complaints ... precluding the necessary time for the generation of an overall program to address systemic deficiencies." I further noted that a "balance must be struck" between the individual and immediate needs of residents and the implementation of a comprehensive program. Finally, I held that the Panel's recommendations "satisfactorily ensure this balance" and ordered defendants to take the following remedial actions:
(1) immediately protect residents who have sustained, or are likely to cause, significant harm to others through 1:1 supervision, and appropriate staff training;
(2) within 60 days, implement training programs that conform to Fairview's September 18, 1989 policy on behavior programs for all residents who have sustained or are likely to sustain significant harm to themselves or are likely to cause significant harm to others;
(3) within 120 days, implement training programs that conform to Fairview's September 18, 1989 policy on behavior programs for all residents who are designated "behaviorally at-risk;" and
(4) immediately retain such outside consultants as are necessary to carry out the mandates of this order.
Defendants' August 31, 1990 Plan, offered in response to the Panel Report and as reflected in my September 1990 order, calls for: (1) development of a special team for clients considered to be at "serious risk" of injury due to behavior; (2) identification of clients at risk due to behavior; (3) assessment of immediate risk situations for each client; (4) complete behavioral reevaluation of the special services (SSP) clients and development and implementation of new behavioral programs for those clients; (5) immediate retention of outside consultants to assist in achieving these goals. In addition, I directed defendants to comply with the monitoring and reporting procedures set forth in Section VII of the Consent Decree.
On October 23, 1990, approximately one month later, plaintiff filed an "emergency motion" challenging the sufficiency of both the plan and defendants' attempts to carry out plan. Plaintiff asserted that Fairview residents' constitutional rights were violated in the following five respects:
(1) the practice of leaving patients unattended while in a head down postural drainage position;
(2) heavily sedating patients for dental procedures without adequate precautions;
(3) failure to provide adequate training and supervision to staff in the care, physical management and transferring of residents with physical disabilities;
(4) failure to properly administer psychotropic medications as part of a coordinated approach to dealing with problematic behaviors and to adequately monitor and detect toxic side effects; and
(5) failure to properly administer and monitor the effect of anticonvulsant medications.
On November 6, 1990 I referred plaintiff's emergency motion to the Advisory Panel:
"for a determination as to whether Fairview is in compliance with the mandates of the Consent Decree ... whether the *507 government's motion raises new issues which were not addressed in this court's previous order dated September 20, 1990 ... [and] whether there has been a delay in reaching a desired level of improvements at Fairview or whether conditions have developed which require adjustment of the improvement plan itself."
On January 15, 1991, the Advisory Panel issued its findings in response to my November order. The Panel acknowledged that "much has been accomplished at Fairview" since the entry of the Consent Decree and the development of the Plan, but found that residents "continue to be repeatedly harmed or exposed to the risk of significant harm." The Panel concluded that Fairview was not in compliance with the Goals, Objectives, and Priority Measure of the Decree and that remedial action was called for. On March 5, 1991 I issued an opinion finding that the Panel's findings "are substantiated and that Fairview residents are not being provided reasonable conditions of safety" as required by Youngberg v. Romeo, 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982). Opinion at 5-7. I directed the State to submit a comprehensive report regarding the success of its new policies and practices to the court and Panel within 30 days so that the Panel and I could determine whether the new policies and practices complied with the mandates of the Consent Decree. In addition, I directed the State to provide a proposed plan as to how to remedy problems associated with the use of anticonvulsant and psychotropic medication. Finally, I directed the Panel to comment upon the State's proposed plan and give its opinion as to whether the Plan was in compliance with the Consent Decree. The Panel submitted its response to my March 5, 1991 order on July 31, 1991 and its findings are discussed, infra.

STANDARDS

a. Contempt

In order to prevail on a motion for contempt, plaintiff must establish the acts of contempt by "clear and convincing evidence." Balla v. Idaho State Board of Corrections, 869 F.2d 461, 466 (9th Cir. 1989). All reasonable doubts must be resolved in favor of the non-moving party. Hanley v. Pacific Livestock, 234 F. 522, 531 (9th Cir.1916). Once a prima facie case is established, the burden of production shifts to the non-moving party to prove either substantial compliance with the court's order or inability to comply. United States v. Rylander, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983). The parties' subjective intent is irrelevant. Crystal Palace, 817 F.2d 1361, 1365 (9th Cir.1987). The sole question is compliance.
However, as I stated during the hearing on September 13, 1991, the difficulty I face in strictly applying such standards to this case and to my order of September 1990, is that the legal standards are too result oriented under the unique circumstances which exist in this case. Pursuant to the terms of the Consent Decree, the parties agreed to implement a process whereby Fairview would improve its facility and services and would undergo monitoring to ensure that the process was moving forward. Thus, the fact that deadlines were not met and injuries continued to occur, standing alone, does not demonstrate non-compliance with the Consent Decree or with my prior orders. Accordingly, my review of the evidence in this case is with a mind toward whether defendants have followed the process as set forth in the Consent Decree and whether they have progressed as required by the Decree.
At Section IIB of the Decree, the parties acknowledge that by entering into the agreement they "intend to ensure that the State does not deprive Fairview residents of their rights and privileges secured to them by the Constitution and laws of the United States" by ensuring that Fairview will satisfy six objectives directed at improved programs, medical care, physical environment and compliance with EHA rights.
All parties agree that the Constitutional standard applicable to Fairview is set forth in the Supreme Court's decision in Youngberg.[7] *508 In Youngberg, the Court emphasized that, while states have a duty to provide certain services and care, even then a state "necessarily has considerable discretion in determining the nature and scope of its responsibility." Id., 457 U.S. at 317, 102 S.Ct. at 2459. Further, the Court held that the standard of judicial review is limited to determining whether "professional judgment" was in fact exercised. Id., at 321, 102 S.Ct. at 2461. Thus, the Court found that decisions made by professionals are "presumptively valid," and that liability may only be imposed where the decision is shown to constitute a "substantial departure from accepted professional judgment." Id., at 323, 102 S.Ct. at 2462; and Thomas S., 902 F.2d 250 (4th Cir.1990). In Shaw v. Strackhouse, 920 F.2d 1135, 1145 (3rd Cir. 1990) the court held that the professional judgment standard must be applied to all failure to protect, excessive restraint and failure to habilitate claims.

b. Review of Advisory Panel Findings

Section IX of the Consent Decree provides that, in reviewing a decision of the Advisory Panel, the court "shall" apply the standards set forth in Section VIII, Paragraph C of the Decree. Paragraph C1 directs that Panel review of specific provisions of the state's plan shall be limited to determining whether they represent "a substantial departure from accepted professional judgment." Any decision by the Panel under this standard is entitled to a rebuttable presumption of correctness. Decree, Section IX, Paragraph 2.

DISCUSSION
As I noted in my introduction, there is a significant overlap of factual and legal issues raised by plaintiff's motion for contempt and the Panel's July 31, 1991 Report. Thus, my review of the government's allegations and the Panel findings is set forth, infra, in parallel fashion, followed by a summary of defendants' responsive submissions to both. Based upon the foregoing, I have consolidated my findings and conclusions as to the government's allegations and the Panel's recommendations to supplement and clarify my oral findings of September 13, 1991.

a. US allegations of Non-Compliance[8]
Plaintiff contends that defendants have failed to comply with Section II B.1-2 and Section V A.1-2 of the Consent Decree and the first prong of my September, 1990, order that they "protect all residents who have sustained or are likely to sustain significant harm to themselves or to cause significant harm to others." Relying upon injury statistics and the reports of its experts, plaintiff contends that defendants have failed to comply with my order. U.S. experts offer anecdotal evidence of injuries that they believe are directly traceable to the lack of appropriate staff supervision.
Plaintiff contends that Fairview residents continue to suffer serious injuries, such as fractures and burns, at an unacceptable rate and that injuries have actually accelerated following my September 1990 order. Plaintiff's expert, Dr. John McGee, cites an increase in pica, biting incidents and other assaultive resident-to-resident behavior. Dr. McGee also contends that many injuries are caused by "aggressive and inappropriate acts of staff," during restraining procedures.
Dr. Dawn Hunter and Dr. Gary Lavigna contend that resident incidents are traceable to a lack of adequate staff supervision and use of unqualified and inadequately trained staff. Dr. Hunter and Dr. Lavigna recount numerous examples of injuries and pica incidents which they feel might have been prevented had staff acted appropriately.
*509 In addition, plaintiff points out that defendants have failed to meet deadlines for implementation of behavior programs and that the impact of the failure is a continuing pattern of injuries and the use of more severe treatment methods such as physical restraint and psychotropic medications. Dr. McGee found that programs in place still fail to address all behaviors that place residents at risk. Dr. Leonard Fielding felt that defendants' inability to quickly modify and adapt behavioral programs is a sign of a systemic failure  programs are not updated or revised to meet needs even when deficiencies are recognized by staff. Fielding cited the example of S.H. who experienced serious side-effects to Lithium in early fall of 1990 which were not responded to until March of 1991. Fielding found a general lack of coordination between staff experts.
Dr. Fielding also took issue with several "systemic problems" related to the use of psychotropic medications. He found that medications were being used without appropriate and adequate behavior management programs, that drug regimens were based upon inadequate behavioral data, that data collected by staff was inaccurate or incomplete, that side-effects were inadequately monitored, and that professional staff failed to coordinate efforts to create comprehensive and integrated psychophar-macological and behavior management programs.
In light of plaintiff's statistical data on injury rates, incident rates, and its conclusion that the use of restraints and psychotropic medications have increased, plaintiff urged the following modifications to the Consent Decree:
(1) Reduction of resident population and increased community placement of "behaviorally at risk" residents.[9] Plaintiff's experts, McGee, Fielding, Hunter and LaVigna, believe that community alternatives are the most viable solution to address continuing harm. The U.S. expert reports vary from a recommendation of 200-300 community placements over a two year period to a nearly immediate closure of the entire facility.
(2) Order Interim Safeguards. Plaintiff suggested utilization of Panel analysis and recommendations of interim measures directed at management structure, deployment, supervision, staff performance evaluation and systems for reviewing restraints and injuries to protect residents until they are placed in community programs.
(3) Increased Panel monitoring, i.e. monitoring on an "on-going basis" with input from the U.S. and Plaintiff-Intervenors, much like the appointment of a "special master." To effectuate this increased role, the Panel would receive "support staff" at state expense.

b. The Panel's July 31, 1991 Report

Following a review of the materials from the State and a visit to Fairview on April 11-13, 1991, the Panel made findings as to the five specific areas identified in the plaintiff's emergency motion. While the Panel notes that the State has made significant efforts towards improvement, it concludes that serious systemic flaws still remain as demonstrated by the fact that over a six month period ending May 31, 1991, ninety-one residents sustained moderate to severe injuries on 104 different occasions. The five areas addressed by the Panel and its findings are briefly summarized as follows:
1. Postural Drainage: The panel found that the problems associated with this practice have been removed since the State discontinued the procedure for all but one resident. As to the one resident for whom the practice is still employed, the panel finds that it is part of an individualized plan and that the level of staff supervision is adequate.
2. Dental Sedation: The Panel concurred with the State's position that this issue is also moot. Dental sedation practices were discontinued at Fairview for all but *510 emergency procedures from October 10, 1991 through April 5, 1991. During the interim, the Panel found "very positive developments" which include: (1) policy revisions requiring more rigorous evaluation and monitoring prior to sedation; (2) establishment of a nursing observation unit designed and staffed for monitoring residents; and (3) added safeguards to ensure residents are not prematurely returned to their cottages after sedation. In light of these developments, the Panel finds that the revised policies and procedures address the issues and concerns raised by the United States. The Panel disagrees, however, with the State's plan to decrease monitoring to a 20% sampling. The Panel recommends that the state incorporate periodic and continuous monitoring of all sedations after full capacity has been reached and sustained.
3. Physical Management and Transfer of Residents: The Panel found that Fairview has made a substantial effort in this area by improving staff training and increasing staff sensitivity, but that five "critical issues" remain unresolved: (1) unrealistic expectations regarding staff ability to assimilate and apply individualized information about each resident; (2) adherence to the idea that some level of harm is unpreventable; (3) permitting staff to continue lifting activities beyond their physical capabilities; (4) inadequate distribution of incident reports to all necessary staff; (5) inadequate monitoring and quality assurance mechanisms.
The Panel pointed to the following incidents which it felt demonstrated continued problems with transfer procedures: (1) a November, 1990 incident in which a resident's arm was broken while being positioned by staff; (2) on April 18, 1991, the same resident fell out of a Hoyer lift and staff failed to discover that he had fractured his left ankle until April 25, 1991.[10]
4. Psychotropic Medications: The Panel concluded that medication is being administered within the context of a behavioral program and not as a "quick fix" for behavior problems. However, it found that the behavioral programs themselves are "woefully inadequate" for the following reasons: (1) many programs are "poorly conceived from a human learning perspective;" (2) although vast amounts of behavioral data is collected, staff members fail to integrate the information into therapy programs;[11] (3) staff members demonstrate insufficient knowledge of the potential side effects of medication and drug regimens of individual residents; and (4) staff members fail to respond to problematic trends quickly  for example, one resident experienced 108 incidents in a six month period before 1:1 staffing was initiated.
The Panel also noted that Fairview has continued to take further steps, beyond the plans submitted in April, to improve its psychotropic medication policy. For example, a new unified resident record is being piloted to replace the fragmented system of dual medical and program records. In addition, defendants have introduced a new Quarterly Individualized Program Plan review into the interdisciplinary team process. Other efforts include increased support to professional staff and an updated data recording system.
5. Anticonvulsant Medications: The Panel expressed some of the same concerns addressed above regarding the staff's inadequate knowledge of drug side-effects and a systemic failure to integrate and properly utilize behavioral data.
Based upon the foregoing, the Panel concluded that, although the State has progressed, three major problems persist to which Fairview's proposed modifications are inadequate: (1) staff knowledge about individual residents; (2) flaws in the creation, execution and maintenance of behavioral *511 intervention programs; and (3) failure to integrate multiple sources of information.
As to the lack of direct care staff knowledge about residents and their individual needs, the Panel suggested that the best solution would be to restructure staff assignments so that the number of residents a particular staff person is assigned to is drastically reduced.
As to the flaws in behavioral programs, the Panel believed that the State's proposals of increased training and quarterly consultations with behavioral psychologists would be of little value. The Panel suggested that the best course at this time would be an immediate upgrading of the programs.
Finally, as to the failure to adequately integrate and utilize data, the Panel urges that the centralization and compilation of all data into an integrated single analysis is critical to assessing the need for program changes and to enable staff to respond quickly to problem areas and avoid serious injuries before they occur.
As to its overall assessment of Fairview, although it found that many of the problems are traceable to the institutional environment, the Panel does not rule out the possibility that safe institutional care is feasible. It notes, however, that the success of institutional care is largely dependent upon a stabilized work force. Thus, the Panel recommends that the State continue to report to the court detailing the progress of initiatives and providing data on incidents and injuries. The Panel also offers to recommend a revised reporting structure if the court so requests.

c. Defendants' Response

Fairview's Director of Quality Assurance, James Clarke, directly contradicts plaintiff's assertion that injuries have increased. Defendants contend that the U.S. unfairly compares 1990-91 to 1988  a year prior to entry of the consent decree when the reporting system was admittedly unreliable. Clarke provides data that the number of injuries has actually decreased from 550 in May of 1990 to 343 in April of 1991. He also points out that the number of unexplained injuries has decreased by over 50% over the last year and that the rate of moderate to severe injuries has remained stable over the last two years. As for restraints, Clarke indicates that the use of certain types of restraints has declined and that emergency restraints were down to forty in April of 1991 compared to 100 in August and September of 1990. He points out that 93% of the restraint time is attributable to mechanical restraints and that 91% of the mechanical restraint time is attributable to one client  T.Q. who has a "long difficult history of self-inflicted injury to his eyes." He further explains that 98% of the restraint statistics represent less-restrictive steps employed to prevent escalation to a full-restraint situation.
Defendants also contend that U.S. experts improperly rely upon minor injuries which do not constitute "significant harm" addressed in Youngberg.[12] Defendants contend that the overall injury rate compares "favorably" to a similar institution in North Carolina and a national norm for state operated facilities. The State's experts, Dr. McIntosh-Wilson and Dennis Reid, conclude that the injury rate reflects reasonable protection from serious harm.
In addition, defendants contend that their systemic data collections (incident reporting system, IAPF form, daily report, 24 hour shift report) and review programs (monthly, quarterly and annual fidelity reviews by cottage managers and IDT reviews) are thorough and comprehensive and adequately respond to continuing and changing resident needs. Defendants take issue with the Panel conclusion that their data collection and distribution system is inadequate given that the Panel fails to mention or discuss the Interdisciplinary Teams (IDTs). As explained by Fairview staff members, IDTs are comprised of professionals from each discipline involved at Fairview who meet informally on a daily *512 basis and quarterly on a formal basis. IDTs integrate behavior data and change behavior plans on an as-needed basis. In addition, defendants point out that individual staff members have developed some of their own internal quality checks, including cottage mentor systems.
In their response to the Advisory Panel Report, defendants explain that the system for direct care staff knowledge of potential side effect of drug therapy have been improved since the Pharmacy and Psychiatric Departments have developed a series of medical cue cards, similar to the behavior prescription cards already in use, which are client specific.
The SSP program which was instituted in August of 1990 to target the group of "at-risk" clients is explained by Fairview Superintendent Margaret Hennessy, Nedra Babcock, Director of Staff Development at Fairview, Daniel Close, an Associate Professor of Special Education at the University of Oregon, Eugene Jablonsky and Richard O'Grady, staff psychologists, Eivind-Erik Sorensen, the SSP coordinator. Defendants hired and reassigned qualified professional staff to oversee the special services project in September of 1990. This team reviewed the programs, behavior prescriptions and injury reports for the preceding 6 months for 242 individuals on the "behavior at-risk" list and selected 51 residents as the focus of the project and developed new programs for all 51. Staff made progress assessments for all other at-risk residents and revised, updated and re-wrote their programs. Thereafter, 20-40 direct care staff were trained regarding the new program for each client. Identification of immediate needs and provisions of immediate measures was completed within the next two weeks. SSP client records were reviewed to determine if there were any discernible behavior patterns.
From September to November 1990 Fairview developed a new frequency based data collections system and trained 900 direct care staff and 220 IDT members in the new system. The staff development team conducted a cottage-by-cottage audit in January 1991 to assess the new system.
Defendants admit that they did not comply with the 60 and 120 day time frames for completion of behavior programs as required in my September 1990 order, but argue that compliance within those time frames was impossible given the complexity of the tasks. Specifically, defendants attribute the delays to: (1) the requirement that they find and utilize outside consultants; (2) a four week visit by HCFA and numerous recommendations and requirements which flowed from the HCFA survey which they contend created a "substantial diversion of staff and resources;" and (3) interference by the plaintiff.
Defendants object to the proposed remedy which they contend will effectively rewrite the Consent Decree well beyond the scope necessary to remedy any constitutional violations. Defendants point out that they have already made a "major commitment" to increasing community based services in that 200 former Fairview residents have already been placed in community programs in the past two years. An additional 100 residents will be moved into similar community programs by June of 1992 and the state has increased the community program budget from $71 million to $311 million.[13] Defendants contend that community placement, as proposed by plaintiff, would "decimate" the State's mental health budget. Finally, defendants argue that plaintiff's proposal would be impossible to achieve within two years since community provider capacity has already been maximized by the HCFA program so that 60% of community providers had to be recruited from out of state.
In addition, defendants argue that the proposed monitoring process offends principles of federalism because it would permit the federal judiciary, through the Advisory Panel, to oversee and control management of Fairview. Defendants also argue that such monitoring would be demoralizing to *513 Fairview staff who have been working diligently to improve conditions.

Findings and Conclusions
In my opinion of March 1989, I found that plaintiff was not entitled to the remedy of community placement simply because it considered such a setting to be the best method of dealing with severely at-risk residents. Similarly, with the present motion, I may not select the best choice amongst a range of professional recommendations. The standard that I must apply to defendants' actions is whether "professional judgement" has been exercised so that residents are protected from unreasonable risks of harm as set forth in Youngberg and Section IIB of Consent Decree.
A review of the voluminous expert reports in this case reveal a classic conflict of two people who, while looking at the same glass of water, are arguing over whether the glass is half full or half empty. The U.S. experts go to great lengths to describe several incidents of residents who injured themselves or others when left unattended or when program updates were delayed. The State describes at least an equal number of success stories of people with severe mental and physical disabilities who are now working in the community and engaging in meaningful social activities.
There is no dispute injuries and incidents of pica and self-abusive behavior continue to occur at Fairview. I find that while some of the examples cited in the U.S. expert's declarations raise significant concerns about the health of Fairview residents  such as the example of J.D. whose behavior program failed to address his history of anorexia  many of the incidents described were not life-threatening and reflect a difference in professional judgment. For example, Dr. Lavigna cites the example of P.C. whose program called for positive reinforcement when she managed not to place objects into her ears. Lavigna observed that staff gave P.C. positive reinforcement for a number of different activities. He criticizes staff for their actions because he feels that P.C. will never learn to associate positive reinforcement with the goal of not sticking objects into her ears. I find that this criticism reflects a difference of professional opinion rather than a violation of the constitutional standards mandated by the Decree.
While my September 1990 order directs defendants to "protect residents from harm," this directive is too result oriented to be applied to this situation literally. Under the contempt standards and the constitutional standards set forth in Youngberg, I believe my inquiry must focus upon whether defendants have taken all reasonable steps to comply with the goal of protecting residents from harm. Although incidents continue to occur, I find that they are not traceable to the defendants' failure to make all efforts to comply with the terms of the Consent Decree, the constitutional standards set forth in Youngberg, and the orders of this court. However, from the standpoint of the court's decision, it is impossible to examine each instance of injury in light of the totality of the circumstances surrounding it. Statistics, as has been amply demonstrated by the parties, are subject to a wide range of manipulation. For example, to say that the injury rate remained at roughly 50% through the period since my September, 1990 order, compared to a 50% level prior to that time period, fails to take into account the fact that approximately 300 of those residents who were most manageable and the least prone to injury have been removed from the population during the HCFA reduction program.
I further find that the results which plaintiff contends should have occurred by now  that of a zero or near zero injury rate and an increased use of creative behavior modification programs in lieu of restraints and medication  have placed Fairview in a catch-22 position. As reflected in Dr. Reid's declaration, I find that while trying to decrease reliance upon physical restraints and medication and increase the use of behavioral modification programs, defendants must necessarily take certain risks that clients may suffer some injuries during the conditioning process. An example of this struggle can be seen with Dr. McGee's reference to K.G. At one point in *514 his declaration, he finds that K.G. received an unnecessary laceration from the watch band of a staff member which might have been prevented had the staff person intervened sooner. Later in his declaration, McGee criticizes staff for injuring K.G. during a mandt restraint.
Thus, I agree with the state that my focus should be more directed toward the progress of eliminating the behavior patterns which lead to potential injury.
In my review of the declarations of Fairview staff members, I was particularly impressed by the candor with which they discussed past failures and the enthusiasm reflected in their efforts towards improvement and progress. For example, Richard Briggs, a Fairview psychologist who helped to implement a pilot project called a "Social Skills Unit" at the apartments for SSP clients describes the residents' progress as "slow, but remarkable." Eugene Jablonsky, another SSP psychologist, notes vast improvements in evaluating the effectiveness of behavior programs and "fine tuning" them. Deanna Ziemer, Unit Director for the Kay and Snell Cottages, and Sara Crawford, United Director at Patterson Cottage, emphasize new steps that they and members of their staff have implemented to increase the effectiveness of behavior programs and program monitoring. I was particularly impressed by the shift in emphasis to community oriented training, the opening of new apartment-like facilities, the IDT review process and the recent plan to implement drug side-effect cards as an additional training tool. Although the staff reports are laudatory, I also see a recognition on the part of Fairview staff and the outside experts that their improvements are part of a progression and that much work remains to be accomplished to improve conditions and programs for the residents.
After reviewing the responses of defendants' experts and staff, I find that the U.S. experts' conclusions of non-compliance are based upon a difference of professional judgment, but fail to establish a substantial departure from accepted professional judgment. I am satisfied, based upon the declarations of Dr. Vickery, Dr. Reid, Dr. McIntosh-Wilson and Dr. Close that the policies, practices and monitoring systems at Fairview are supported by qualified professional opinion and in accordance with accepted professional standards. The Panel Report, insofar as its findings and conclusions relate to the behavioral management programs, is also aimed at proposed improvements rather than a finding that Fairview's policies and practices fail to meet constitutional standards.
As I see it, the real issue raised by plaintiff's motion and the Panel Report is whether my previous order and the provisions of the Consent Decree are adequate. I feel that the suggestion made by Dr. Lavigna that Fairview simply close its doors and immediately relocate residents to community treatment facilities is completely counterproductive to the Consent Decree process agreed to by the parties and approved by this court. I am further satisfied that more down-sizing of the population would not necessarily result in greater protection of Fairview residents as some number of injuries will exist in any environment. I further find that premature or inappropriate community placements would result in a much higher risk of potential harm than residents are exposed to at Fairview. I further find that increased panel responsibility would be inappropriate under the law and in contravention of Section XIII of the Consent Decree. Thus, even if I were to find that defendants were in contempt of my September 1990 order, I would not grant the relief plaintiff seeks.

CONCLUSION
Under the contempt standards, as I have modified them to comport with the terms of the Consent Decree and Youngberg, I find that plaintiff has failed to carry the burden of persuasion regarding contempt and that defendants have taken all reasonable steps to comply with the goal of protecting residents from harm. I further find that the policies, practices and monitoring systems at Fairview are supported by qualified professional opinion which comports with accepted professional judgment.
*515 Upon consideration of the United States October 9, 1990 Emergency Motion, defendants' response, the Advisory Panel Reports of January 15, 1991 and July 31, 1991, the parties' responses to the Panel Reports, and in light of my oral findings and conclusions of September 13, 1991, and my written findings and conclusion set forth infra, I find that the issues of dental sedation and postural drainage are moot; defendants' policies and procedures relating to behavioral programs, physical management, psychotropic medications and anticonvulsants are consistent with the consent Decree and the constitutional standard set forth in Youngberg. Defendants should carefully review and consider the Advisory Panel's suggestions for improvement. However, I find that the present monitoring and reporting systems, as set forth in Section VII of the Decree are adequate and meet minimum constitutional requirements. Therefore, I leave the decision of whether the present systems should be modified in accordance with the Panel's proposal to the sound discretion of the professionals at Fairview.
NOTES
[1] As an example, I noted that terms such as "adequate" and "reasonable" which appear in Section II of the Consent Decree should be further defined so that the court and parties have some sort of professionally formulated yardstick to measure progress or regression.
[2] I advised counsel at the September 13 hearing that I had received and read the Panel Report and defendants' response to the report. Plaintiff filed its reply to the report on September 20, 1991, shortly after the contempt hearing.
[3] Since 1987, when I was first assigned to this case, I have issued eight written opinions in addition to numerous orders and oral rulings during evidentiary hearings. The following is a brief summary overview of the case history from the court's perspective, provided to assist the reader in placing the present issues into both a temporal and factual context.
[4] In addition, I denied defendants' motion to dismiss intervenors' claim under § 504 to the extent they alleged that existing community-based placement programs were being administered on a discriminatory basis and granted dismissal to the extent the claim asserted that defendants were under any affirmative obligations to develop new community-based placement programs.
[5] On July 24, 1989 I signed an order of dismissal with prejudice for intervenors' claims under the Rehabilitative Act and Title XIX of the Social Security Act based upon a notice of settlement as to those claims.
[6] Intervenors objected to approval of the decree arguing that it improperly focused State resources on improving Fairview instead of moving residents into community placement. Intervenors also objected on the grounds that the decree failed to provide for specific relief, failed to ensure defendants' compliance; failed to guarantee that the Center would be radically reduced in size and that monitoring and compliance responsibilities rested solely with the government with inadequate provisions for participation by residents' parents and guardians.
[7] In my research, I discovered that Youngberg is still the controlling authority on the issue of the level of care required of states in the operation of institutions for the mentally retarded. See DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (extensive discussion of the continuing viability of Youngberg).
[8] Plaintiff-Intervenors support the U.S. motion for contempt and concur in its recommendations regarding community placement and increased monitoring by the Panel.
[9] Plaintiff contends that the State's HCFA plan reduction for school aged children is inadequate.
[10] The Panel noted that this particular individual suffers from osteoporosis which makes him particularly susceptible to fractures. It found, however, that this resident's heightened sensitivity was not adequately taken into account by the staff members who are assigned to transfer him and medical staff who failed to diagnose his second injury in a timely manner.
[11] The Panel believes that failure to integrate data will lead to inaccurate behavioral programs and an unnecessary increase in the use of medications.
[12] The state defines "minor injuries" as those "minor scratches, scrapes, bruises and small burns which a typical family would treat with basic first aid at home."
[13] Defendants also note that many parents of Fairview residents are opposed to community placement.