796 F.Supp. 1194 (1992)
Taurean NORFLEET, By and Through his parent and administratrix, Toi NORFLEET; Aaron Norfleet, by and through his parent, Toi Norfleet; and Toi Norfleet in her individual capacity, Plaintiffs,
v.
STATE OF ARKANSAS DEPARTMENT OF HUMAN SERVICES; Richard Dietz, individually, and in his official capacity; Robert Brooks, individually, and in his official capacity; and, Johnnie Armstrong, individually, and in her official capacity, Defendants.
No. LR-C-91-745.
United States District Court, E.D. Arkansas, W.D.
June 1, 1992.
*1195 Michael Andrew LeBoeuf, Wallace & Hamner, Little Rock, Ark., for plaintiffs.
Debby Thetford Nye, Dept. of Human Services, Office of Chief Counsel, Amy Lynne Ford, Arkansas Dept. of Human Services, Office of Chief Counsel, Little Rock, Ark., for defendants.

MEMORANDUM AND ORDER
SUSAN WEBBER WRIGHT, District Judge.
Taurean Norfleet died after being taken into protective custody and placed in a foster home by the State of Arkansas Department of Human Services (DHS). The plaintiffs say that his death was the result of the defendants' failure to provide appropriate medical care. They bring this lawsuit under 42 U.S.C. § 1983, alleging that such failure violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[1]
The DHS is responsible for administration of social services in the State of Arkansas, including long term and temporary foster care programs for children. Richard Dietz was Director of the Division of Children and Family Services of the DHS. Robert Brooks was a case worker in that division, and Johnnie Armstrong was a certified foster parent operating a foster home for the division. They move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on several grounds: (1) the DHS is an entity of the State of Arkansas and therefore immune under the Eleventh Amendment from section 1983 liability; (2) Dietz, Brooks, and Armstrong are protected by qualified immunity; (3) Brooks and Armstrong are immune from liability under state law; and *1196 (4) negligent conduct is not actionable under section 1983. The defendants also move for dismissal under Rule 12(b)(6) of the claims of Aaron Norfleet and Toi Norfleet for failure to allege that they were deprived of a constitutional right. For the reasons that follow, the Court finds that the defendants' motions should be granted in part and denied in part.

I.
The facts alleged in this case, if true, are undeniably tragic. On Saturday, August 17, 1991, Toi Norfleet left her children, Taurean and Aaron, with her next-door neighbor and babysitter, Sheila Tolbert, while Ms. Norfleet was on a two and one-half day trip to Memphis, Tennessee. Taurean had a history of medical problems involving asthma, a condition for which he had been treated on numerous occasions and for which he had a standing physician at the Arkansas Children's Hospital.
In the early morning hours on Sunday, August 18, Taurean apparently suffered an asthma attack requiring medical attention. Ms. Tolbert contacted emergency medical personnel who transported Taurean to Baptist Memorial Hospital for treatment. For reasons not specified in the complaint, Ms. Tolbert was arrested by city police officers and Aaron was placed in the custody of another neighbor.
After treatment at the hospital, Taurean was given two types of medication to take with him, and then was released into the custody of Mr. Brooks of the DHS. Mr. Brooks, however, failed to obtain proper medical information or assistance from hospital personnel as to the ongoing care and treatment of Taurean's medical condition. He took Taurean to the home of Ms. Armstrong around 7:30 a.m. Ms. Armstrong also did not request medical information about the treatment of Taurean's condition.
Throughout that day and the next, Taurean apparently consumed all or most of his medication. Ms. Armstrong neither supervised the use nor took possession of Taurean's medication. About 12:30 a.m. on Tuesday, August 20, Taurean began having trouble breathing and told Ms. Armstrong. She sent him back to his room, where he expressed additional concern over a lack of medication. Later, after apparently realizing the seriousness of Taurean's condition, Ms. Armstrong called emergency medical personnel, who arrived at 2:37 a.m. and transported Taurean to the Arkansas Children's Hospital. Taurean was pronounced dead at 3:35 a.m.
Taurean's mother, Ms. Norfleet, had returned from Memphis around 4:20 p.m. on Monday, August 19, while Taurean was still at Ms. Armstrong's home. Upon arrival, she called the DHS to inquire about her son, but received only prerecorded messages at all available DHS numbers. She then drove to the police department to seek assistance in locating her son. The police put her in contact with an unidentified DHS worker at that time, and she later was contacted by a DHS social worker who informed Ms. Norfleet that her son was fine and that he probably could be returned to her the following morning (Tuesday). Aware that her son had been treated at Baptist Memorial Hospital, Ms. Norfleet asked the social worker about Taurean's condition. She was told that he was fine, but that she could not speak with the foster parent who had custody of Taurean. Although uncomfortable with this procedure, Ms. Norfleet believed she could not obtain custody of or visit with Taurean until the following morning, so she took no further action. DHS personnel woke her around 5:00 the next morning and notified her that her son had died.
The plaintiffs allege that the defendants were aware or should have been aware of deficiencies within the DHS that resulted in the failure to provide proper and adequate medical attention to children in the care of foster parents. They say that the defendants, while aware of problems with the licensing and training of foster parents, continued to operate under a policy or practice that did not require foster parents to be either medically trained or medically proficient in providing for or responding to the medical needs of foster children. They further claim that the defendants failed to adequately train or supervise DHS personnel *1197 involved with Taurean and that the defendants acted with deliberate indifference to Taurean's medical needs while he was in state custody, including failing to obtain adequate medical treatment information and to respond to his continued requests for medical attention.

II.
Under Rule 56(c), summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment "correctly results from the application of substantive law to facts established beyond reasonable controversy," Woodsmith Publishing Co. v. Meredith Corp., 904 F.2d 1244, 1247 (8th Cir.1990), but should not be granted if a fair-minded jury could return a verdict for the nonmoving party on the evidence presented, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
The moving party bears the burden of setting forth facts to show that he is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant to demonstrate that there exists a genuine issue as to material fact, and "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255, 106 S.Ct. at 2514. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be "outcome determinative" under applicable law. Holloway v. Pigman, 884 F.2d 365, 366 (8th Cir.1989); Twin City Bank v. Verex Assurance, Inc., 733 F.Supp. 67, 67-68 (E.D.Ark.1990).

III.
A state is not a "person" within the meaning of 42 U.S.C. § 1983 and thus may not be sued under that statute. Will v. Michigan Dept. of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Moreover, the Eleventh Amendment bars section 1983 suits against state governments in federal courts. Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). An agency of state government, such as the DHS, is part of the state for purposes of the Eleventh Amendment. See, e.g., Florida Dept. of Health & Rehabilitative Svcs. v. Florida Nursing Home Ass'n, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (per curiam); Caldwell v. LeFaver, 928 F.2d 331 (9th Cir.1991).
State officers sued in their official capacity likewise are not "persons" under section 1983 because they assume the identity of the government that employs them. That is, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," Will, 491 U.S. at 71, 109 S.Ct. at 2311, and therefore is "no different from a suit against the State itself," id. This broad language, however, means only that a suit cannot be brought against the officer, in his or her official capacity, for money damages to be paid by the state treasury. The Court explained in Will that "a State official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because `official-capacity actions for prospective relief are not treated as actions against the State.'" Id. at 71 n. 10, 109 S.Ct. at 2311 n. 10 (quoting Kentucky v. Graham, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985)). State officers also may be held personally liable for money damages under section 1983 based upon actions taken in their official capacities. Hafer v. Melo, ___ U.S. ___, 112 S.Ct. 358, 360, 116 L.Ed.2d 301 (1991).
The plaintiffs urge that Will cannot and should not be read to exclude suit against a state or state agency for prospective and injunctive relief. The Court disagrees. A state agency may not be sued in federal court, regardless of the relief sought, unless the state has waived its sovereign immunity or Congress has overridden it. Pennhurst State School & *1198 Hosp. v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984); Whittington v. Milby, 928 F.2d 188, 193 (6th Cir.1991); Southern Pacific Transportation Co. v. City of Los Angeles, 922 F.2d 498, 508 (9th Cir.1990). The State of Arkansas has not consented to be sued under section 1983 and Congress did not override states' sovereign immunity when it enacted section 1983. See Will, 491 U.S. at 66-67, 109 S.Ct. at 2309-10.
The Court finds that the plaintiffs' claims against the DHS itself, as well as those against the individual defendants in their official capacities for money damages, are barred as a matter of law. The Court denies summary judgment, however, for the individual defendants in their official capacities to the extent that the relief sought is prospective. The complaint alleges that the DHS and its employees have failed to properly care for children placed in its foster care program and seeks injunctive relief for those failures. Such claims are not prohibited by law, and the defendants have failed to show that there are no disputed issues of material fact relating to those claims.

IV.
Defendants Dietz, Brooks, and Armstrong argue that they are entitled to qualified immunity from section 1983 liability in their individual capacities under Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity from liability for civil damages exists where the defendants' actions do not violate "clearly established constitutional rights of which a reasonable person would have known." Id. at 818, 102 S.Ct. at 2738.
On a motion for summary judgment prior to discovery, a court appropriately may determine "not only the currently applicable law, but whether that law was clearly established at the time [the] action occurred." Id. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). While the specific action at issue need not have been previously held unlawful, the alleged unlawfulness must be "apparent" in light of preexisting law. Id.
Summary judgment is appropriate where the court decides that even if the defendants committed the alleged violation of the plaintiff's rights, those rights were not well established at the time of the violation. However, once a court concludes as a matter of law that a legal standard governing the official's conduct at issue was clearly established, the qualified immunity defense ordinarily should fail. Harlow, 457 U.S. at 818-19, 102 S.Ct. at 2738-39. Accord Warren v. City of Lincoln, 816 F.2d 1254, 1261 (8th Cir.1987). This "threshold immunity question" must be decided before discovery proceeds. Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. A court ruling denying qualified immunity is immediately appealable. Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).
The question, then, is whether the law governing the defendants' conduct in this case was clearly established in August 1991. That is, whether a reasonable official would have understood at that time that when the state removes a child from the custody of his parents or their agents, the state owes that child a duty of safekeeping, and that deliberate indifference to the serious medical needs of a child in state custody violates the Due Process Clause.
This case is unlike DeShaney v. Winnebago County Dept. of Social Svcs., 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), where the victim was injured at the hands of a private individual who was neither an agent of the state nor employed by the state. In that case, the Supreme Court held that the government's failure to protect individuals from privately-inflicted wrongs generally cannot violate the Due Process Clause. The guardians of four-year-old Joshua DeShaney sued the Department of Social Services for its failure to protect the child from his father's beatings after being informed of possible abuse. The Court decided that there was no constitutional *1199 violation because the child was not in the government's custody and because the abuse occurred at the hands of a private party.
[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.... Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes.
Id. at 195-96, 109 S.Ct. at 1003-04.
DeShaney made clear, however, that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." 489 U.S. at 198, 109 S.Ct. at 1005. Two cases primarily provide the basis for this rule. In Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Court held that the Eighth Amendment requires a state to provide adequate medical care to incarcerated prisoners because a prisoner is unable "`by reason of the deprivation of his liberty [to] care for himself.'" Id. at 103, 97 S.Ct. at 290. (quoting Spicer v. Williamson, 191 N.C. 487, 490, 132 S.E. 291, 293 (1926)). The Court extended this analysis in Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), holding that substantive due process requires a state to provide involuntarily-committed mental patients with such services as are necessary to ensure their "reasonable safety" from themselves and others. Id. at 314-325, 102 S.Ct. at 2457-63. It indicated in dictum that a state also is obligated to provide such individuals with "adequate food, shelter, clothing, and medical care." Id. at 315, 102 S.Ct. at 2457. The rationale was the same; when the state deprives a person of his liberty and holds him in custody against his will, the state assumes a corresponding affirmative duty to provide for his safety and general well-being. DeShaney, 489 U.S. at 199-200, 109 S.Ct. at 1005-06.
From these cases, the DeShaney Court concluded that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." 489 U.S. at 200, 109 S.Ct. at 1006.
In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf  through incarceration, institutionalization, or other similar restraint of personal libertywhich is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.
Id. Accord Wideman v. Shallowford Community Hospital, Inc., 826 F.2d 1030, 1035-36 (11th Cir.1987) ("The key concept is the exercise of dominion or restraint by the state. The state must somehow significantly limit an individual's freedom or impair his ability to act on his own before it can be constitutionally required to care and provide for that person.").
The Supreme Court has never recognized a constitutional duty of care or protection beyond the cases of incarcerated prisoners and involuntarily-committed mental patients. Lower courts, however, have not treated this as an exhaustive list, and DeShaney clearly left open the possibility that the Due Process Clause may impose an affirmative duty to provide care and protection to children placed in foster homes by the state.
Had the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration *1200 or institutionalization to give rise to an affirmative duty to protect. Indeed, several Courts of Appeals have held, by analogy to Estelle and Youngberg, that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents.
489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9 (citing Doe v. New York City Dept. of Social Services, 649 F.2d 134, 141-42 (2d Cir.1981), after remand, 709 F.2d 782, cert. denied sub nom. Catholic Home Bureau v. Doe, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); Taylor ex rel. Walker v. Ledbetter, 818 F.2d 791, 794-97 (11th Cir.1987) (en banc), cert. denied sub nom. Ledbetter v. Taylor, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989)). See also Meador v. Cabinet for Human Resources, 902 F.2d 474 (6th Cir.1990) (children placed in state-regulated foster homes have due process right to personal safety).
The Seventh Circuit, which otherwise has taken a narrow view of constitutional duties arising from custodial or other special relationships, see, e.g., J.O. v. Alton Community Unit School Dist. 11, 909 F.2d 267 (7th Cir.1990) (refusing to find a special custodial relationship between teachers and students), Bowers v. DeVito, 686 F.2d 616 (7th Cir.1982) (state has no constitutional duty to protect citizens from released criminals or madmen), recognized in K.H. ex rel. Murphy v. Morgan, 914 F.2d 846, 852 (7th Cir.1990), the constitutional right "of a child in state custody not to be handed over by state officers to a foster parent or other custodian, private or public, whom the state knows or suspects to be a child abuser" (emphasis in original). It also concluded that this right was clearly established in 1986. Id. at 850-53. Judge Posner, writing for the court, distinguished DeShaney:
Here, in contrast, the state removed a child from the custody of her parents; and having done so, it could no more place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the Fourteenth Amendment than it could deliberately and without justification place a criminal defendant in a jail or prison in which his health or safety would be endangered, with violating his [constitutional] rights....
....
[T]he State of Illinois has no constitutional obligation to protect children from physical or sexual abuse by their parents. The state could have left K.H. to the tender mercies of her parents without thereby violating her rights under the Constitution. But having removed her from their custody the state assumed at least a limited responsibility for her safety. If the fire department rescues you from a fire that would have killed you, this does not give the department a constitutional license to kill you, on the ground that you will be no worse off than if there were no fire department. The state, having saved a man from a lynch mob, cannot then lynch him, on the ground that he will be no worse off than if he had not been saved.... Once the state assumes custody of a person, it owes him a rudimentary duty of safekeeping no matter how perilous his circumstances when he was free.
Id. at 849. Consistent with this distinction, Milburn v. Anne Arundel County Dept. of Social Services, 871 F.2d 474, 476 (4th Cir.), cert. denied, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 106 (1989), emphasized the state's lack of responsibility for a child's voluntary placement by the natural parents in an abusing private foster home.
Youngberg and DeShaney arguably reach the constitutional right the plaintiffs assert to be clearly established in 1991. However, a right need not have been recognized by the Supreme Court to be established; such a rule "could have the practical effect of converting qualified immunity into absolute immunity." Benson v. Allphin, 786 F.2d 268, 275 (7th Cir.), cert. denied, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986). The cases cited above show that a right to care and protection while in foster care was established in the Second Circuit by 1981 (Doe), in the Seventh *1201 Circuit by 1986 (K.H.), in the Eleventh Circuit by 1987 (Taylor), and in the Sixth Circuit by 1990 (Meador).[2] The Tenth Circuit recently visited this question in Yvonne L. v. New Mexico Dept. of Human Svcs., 959 F.2d 883 (10th Cir.1992), and concluded that such a right was clearly established in that circuit in 1985.
By 1991, no case in the Eighth Circuit had held to the contrary, and there was no reason to think that these cases would not be followed in the circuit. Although prior to DeShaney the Eighth Circuit had taken a very narrow view of the constitutional duty to care and protect, see Harpole v. Arkansas Dept. of Human Services, 820 F.2d 923, 927 (8th Cir.1987) ("[w]e do not believe that the concept of special relationships was intended to extend beyond prison or prison-like environments"), subsequent cases demonstrated that this view no longer prevailed, see Freeman v. Ferguson, 911 F.2d 52 (8th Cir.1990), Wells v. Walker, 852 F.2d 368 (8th Cir.1988). For a fuller discussion of the demise of Harpole, see this Court's opinion in Dorothy J. v. Little Rock School District, 794 F.Supp. 1405 (E.D.Ark.1992).
The present lawsuit has the essential component required in Youngberg, DeShaney, and the circuit court cases, namely, a state-imposed restraint of the foster child's freedom by taking custody of the child and placing him in a foster home. Moreover, the foster home in this case was operated by an agent of the state.[3] The Court is convinced that these cases clearly alerted persons in positions such as the defendants that children in state custody have a constitutional right to reasonable care and protection, especially in the case of a serious medical need. The defendants therefore are not entitled to judgment as a matter of law on the ground of qualified immunity.

V.
The remaining issues can be disposed of quickly. The defendants argue that they are absolutely immune from section 1983 liability by virtue of state law. See Ark.Code Ann. §§ 12-12-517 and 9-28-412. However, conduct that is wrongful under section 1983 cannot be immunized by state law. Martinez v. California, 444 U.S. 277, 284 n. 8, 100 S.Ct. 553, 558 n. 8, 62 L.Ed.2d 481 (1980).
The defendants also claim that since negligence is insufficient to demonstrate a deprivation of due process, see Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), they are entitled to judgment as a matter of law with respect to the negligence claims in the plaintiffs' complaint. The Court agrees. However, the allegations in the complaint of deliberate or conscious indifference to the plaintiffs' constitutional rights are sufficient to overcome either a Daniels or Davidson bar.
Finally, the defendants urge dismissal under Rule 12(b)(6) of the claims of plaintiffs Toi Norfleet (Taurean's mother) in her own right and Aaron Norfleet (Taurean's brother) on grounds of qualified immunity and that they are generalized and without merit. Dismissal for failure to state a claim is warranted only when it appears beyond doubt that the plaintiff can *1202 prove no set of facts in support of her claim which would entitle her to relief. Hishon v. King & Spaulding, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); May v. C.I.R., 752 F.2d 1301 (8th Cir.1985).
The Supreme Court has yet to address whether and when the government's involvement in the death of one family member deprives other family members of a cognizable liberty interest in continued association with the decedent. However, many courts have held that parents possess a constitutionally-protected liberty interest in the companionship and society of their children, and the state's deprivation of that interest without due process of law is remediable under section 1983. See, e.g., Kelson v. City of Springfield, 767 F.2d 651, 653-55 (9th Cir.1985); Bell v. City of Milwaukee, 746 F.2d 1205, 1242-45 (7th Cir.1984). This has been the law in the Eighth Circuit since 1976. See Mattis v. Schnarr, 502 F.2d 588, 593-95 (8th Cir. 1976). The Court therefore finds that Toi can assert a personal claim under section 1983 and that the complaint is sufficiently specific in this regard.
Whether one sibling can assert a section 1983 action based on the death of the other presents a more difficult question. Compare Trujillo v. County Commissioners, 768 F.2d 1186, 1188-89 (10th Cir.1985) (siblings also have a liberty interest in familial relationships), Aristotle P. v. Johnson, 721 F.Supp. 1002, 1005-08 (N.D.Ill.1989) (same), and Danese v. Asman, 670 F.Supp. 729, 737-39 (E.D.Mich. 1987) (same), with Ortiz v. Burgos, 807 F.2d 6, 9 (1st Cir.1986) (rejecting right of stepfather and siblings); Bell, 746 F.2d at 1242-48 (recognizing parental right but specifically rejecting right of siblings). The Court, however, does not need to decide this question because it finds that the law in this area is not clearly established and the defendants are entitled to qualified immunity. The Court therefore will treat the motion to dismiss Aaron's claims as a motion for summary judgment on the question of qualified immunity and grant it on that ground.
IT IS ORDERED that the defendants' motion for summary judgment is granted with respect to the plaintiffs' claims (1) against the DHS, (2) against the individual defendants in their official capacities for money damages, (3) against all defendants for negligence. Summary judgment in favor of the defendants also is granted on the claims of Aaron Norfleet. The motion is denied as to all other issues.
NOTES
[1] The plaintiffs also alleged a cause of action under the Adoption Assistance and Child Welfare Act of 1980, codified at 42 U.S.C. §§ 620-628, 670-679a. Since their complaint was filed, the Supreme Court in Suter v. Artist M., ___ U.S. ___, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), held that the Act does not create an implied right of action or confer on its beneficiaries a private right enforceable under 42 U.S.C. § 1983. The parties agree that this claim should be and hereby is dismissed.
[2] The Eleventh Circuit in Taylor did not address the specific question of when this constitutional right was clearly established. The incident in that case occurred in 1982. At a minimum, Taylor makes the law clearly established in the Eleventh Circuit in 1987, but the opinion implies that Estelle, Youngberg, and Doe established the right much earlier. Similarly, the Sixth Circuit in Meador declined to consider the qualified immunity issue because it was not raised below. Considering incidents that took place in 1985, the court relied on Taylor and Doe in recognizing a due process right to personal safety in foster homes. Previously, the Sixth Circuit had held in Eugene D. ex rel. Olivia D. v. Karman, 889 F.2d 701, 708-09 (6th Cir. 1989), that such a right was not a clearly established federal right from 1974 through 1982.
[3] Ms. Armstrong is identified in the defendants' answer as "a certified foster parent, operating a foster home in Pulaski County for the Division of Children and Family Services." Answer ¶ 2e. The defendants also concede that "[a]t all time [sic] relevant to the allegations in the Complaint, defendants Dietz, Brooks, and Armstrong were acting within their official capacities as officials of the Division of Children and Family Services." Id. ¶ 3.