# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3394

_____

| | | |
|---|---|---|
| Susan Norris, | * | |
| | * | |
| Plaintiff/Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Jacquita Engles, Individually and in | * | Appeal from the United States |
| her official capacity as an employee of | * | District Court for the |
| the Independence County Sheriff's | * | Eastern District of Arkansas. |
| Department, | * | |
| | * | |
| Defendant/Appellant, | * | |
| | * | |
| Keith Bowers, in his official capacity | * | |
| as Sheriff of Independence County | * | |
| Arkansas, | * | |
| | * | |
| Defendant. | * | |

_____

Submitted: April 13, 2007
Filed: August 9, 2007

_____

Before WOLLMAN, BEAM, and COLLOTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Jacquita Engles appeals from the district court's denial of her motion for summary judgment in this action brought by Susan Norris under 42 U.S.C. § 1983. We reverse and remand.

## I.

Norris was diagnosed with manic bipolar depression at age fifteen. One of the symptoms of her psychological disorder is self-mutilation. On March 21, 2005, Norris was feeling depressed and, in an attempt to avoid resorting to self-mutilation to ease her pain, called the Vista Health Hotline. After explaining her situation to a woman who worked for the hotline, Norris ended the conversation because she felt that the woman was not helping her. One of the hotline's employees thereafter called the Batesville, Arkansas, police dispatch and advised them of the situation. Deputy Jeremy Page of the Independence County Sheriff's Department was dispatched to the scene and found Norris at her neighbor's home. After conversing with Norris, Page decided to take her into protective custody and then brought her to the Independence County Jail.

Engles was on duty at the jail when Norris was brought in. Deputy Page informed Engles that Norris was in protective custody because she was trying to harm herself. Page gave Norris's medication to Engles, the administration of which required the use of a peripherally inserted central catheter (PICC line) – an intravenous line that had been surgically implanted into Norris's arm. Norris was allowed to take some of this medication while at the book-in desk.

Engles eventually placed Norris in a padded cell and had her take off her clothes, during which time Engles noticed several cuts on Norris's stomach. After she had removed her clothes, Norris complained of being cold. While Norris was in the cell, Engles sought information from her so she could complete the intake paperwork. The two spoke through a hole in the cell door and, according to Engles's deposition

testimony, during this conversation Norris told Engles that she had had thoughts of cutting herself and of committing suicide.

At some point during her detention, Norris, frustrated with her situation, stated that she was going to pull out her PICC line and that she would bleed to death. She thought that by taking such action, she would be able to obtain a blanket or some type of clothing. Engles informed her supervisor of what Norris had said and was told to handcuff Norris's arms behind her back to prevent her from pulling out her PICC line. Engles subsequently did as instructed. Shortly thereafter, Norris stepped through the handcuffs and brought her arms in front of her. In response, Engles, again acting on advice from her supervisor, re-cuffed Norris's arms behind her back and then used a pair of leg irons to cuff her to a grate in the floor of the cell, which served as an open toilet, by attaching one end of the leg irons to the grate and one end to the handcuffs. Engles also wrapped Norris's arm and PICC line in gauze and attached an additional set of leg irons to Norris's ankles. When secured in this manner, Norris could not stand up. She remained restrained in this position until she was taken to a medical facility where the cuts on her stomach could be examined.[1] While it is not clear exactly how long Norris was restrained in this manner, it appears that it was, at most, approximately three hours.[2] After she was examined at the medical facility, Norris was returned to jail. There, Norris met with the mental health screener and was subsequently released upon his recommendation.

Norris filed this lawsuit, asserting, as characterized by the district court, that 1) her Fourteenth Amendment procedural due process rights were violated when she was taken to the county jail instead of to the hospital, 2) her Fourteenth Amendment

---

[1]Norris asserts that at some point prior to leaving for the medical facility, Engles hit her with handcuffs, and that either Engles or another jailer kicked her.

[2]The record indicates that Norris arrived at the jail at 7:23 p.m. and that Engles entered Norris's cell to transport her to the hospital at 10:40 p.m.

substantive due process rights were violated when Engles restrained her at the jail, and 3) her Fourth Amendment rights were violated because excessive force was used against her at the jail. The district court subsequently granted the defendants' motion for summary judgment on Norris's procedural due process claim, but denied the motion for summary judgment on her substantive due process claim.[3] As part of its denial of the defendants' motion for summary judgment on Norris's substantive due process claim, the district court concluded that Engles was not entitled to qualified immunity because Norris "presented sufficient facts to establish an underlying constitutional violation" and because "the [alleged constitutional] right was clearly established." Engles then filed this interlocutory appeal, contesting the district court's denial of her request for qualified immunity.[4]

---

[3]As to Norris's Fourth Amendment claim, the district court stated that "[a]lthough Engles denies she hit Norris with a pair of handcuffs or kicked her, she does not move for summary judgment on Norris' Fourth Amendment excessive force claim."

[4]We have jurisdiction to hear Engles's interlocutory appeal because it contests the district court's legal determination that the alleged facts establish a violation of a clearly established constitutional right. Brayman v. United States, 96 F.3d 1061, 1063-64 (8th Cir. 1996) ("[A]ppellate review of the qualified immunity issue is limited to the purely legal question of 'whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law.'" (quoting Johnson v. Jones, 515 U.S. 304, 313 (1995))). In doing so, we "take, as given, the facts that the district court assumed when it denied summary judgment for that (purely legal) reason," and if the district court does not state those facts, we must perform a "review of the record to determine what facts the district court . . . likely assumed." Johnson, 515 U.S. at 319. After reviewing the record, we conclude that the relevant facts provided below, which were largely undisputed, were assumed by the district court in making its determination.

-4-

## II.

We review "de novo the denial of a motion for summary judgment based on qualified immunity." Vaughn v. Ruoff, 253 F.3d 1124, 1127 (8th Cir. 2001). To decide whether Engles is entitled to qualified immunity, two inquires must be made. First, we must determine "whether the facts alleged, taken in the light most favorable to [Norris], show that [Engles's] conduct violated a constitutional right." Flowers v. City of Minneapolis, 478 F.3d 869, 872 (8th Cir. 2007). "If so, then we determine whether the constitutional right was clearly established at the time." Id. "If either question is answered in the negative, the public official is entitled to qualified immunity." Vaughn, 253 F.3d at 1128. For the reasons stated below, we conclude that Engles's conduct did not violate a constitutional right and that she is therefore entitled to qualified immunity.

The constitutional right at issue in this appeal is Norris's right to substantive due process arising under the Fourteenth Amendment. This substantive due process right "'protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them.'" Flowers, 478 F.3d at 873 (quoting Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992)). To establish a violation of an individual's substantive due process rights, the "plaintiff 'must demonstrate *both* that the official's conduct was conscience-shocking, *and* that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" Slusarchuk v. Hoff, 346 F.3d 1178, 1181-82 (8th Cir. 2003) (emphasis in original) (quoting Moran v. Clarke, 296 F.3d 638, 651 (8th Cir. 2002) (en banc)).

In Youngberg v. Romeo, a case that addressed the bodily restraint of a mentally handicapped individual who was involuntarily committed to a state institution, the Supreme Court stated that "[l]iberty from bodily restraint always has been recognized

as the core of the liberty protected by the Due Process Clause from arbitrary governmental action" and that this interest survives involuntary commitment. 457 U.S. 307, 316 (1982) (quotations omitted). The Court further recognized, however, that in the involuntary commitment setting, this right is not absolute, for it at times conflicts with the individual's and other residents' liberty interest in their own safety. Id. at 319-20 ("In operating an institution . . . there are occasions in which it is necessary for the State to restrain the movement of residents – for example, to protect them as well as others from violence."). To determine whether an individual's fundamental rights have been violated in such a situation one must therefore balance the individual's liberty interests against the State's asserted reasons for restraining the individual. Id. at 320-21 ("The question then is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint or lack of absolute safety is such as to violate due process."). With this in mind, however, we note that even if it is determined that the conduct at issue violated a fundamental right, it will constitute a substantive due process violation only if it is also determined to shock the conscience. Slusarchuk, 346 F.3d at 1181-82.

Norris asserts that the manner in which she was restrained by Engles constituted a substantive due process violation because it violated her fundamental right to be free from bodily restraint and shocks the conscience. We disagree, for even if we assume, *arguendo*, that Engles's conduct violated Norris's fundamental right, we conclude that it was not conscience-shocking.

As the Supreme Court has instructed us, "in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id. at 849. Whether conscience-shocking conduct has occurred is "'tested by

-6-

an appraisal of the totality of facts in a given case.  That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial.'"  Id. at 850 (quoting Betts v. Brady, 316 U.S. 455, 462 (1942)).

Viewed in the light most favorable to Norris, the facts establish that Norris was taken to the jail because she had thoughts of harming herself and, once there, threatened to pull her PICC line out and bleed to death in an effort to obtain a blanket or some type of clothing.  No doubt the restraint employed by Engles after Norris stepped through her handcuffs was uncomfortable and that it significantly restrained Norris's movement.  We must, however, appraise the totality of the situation when determining whether the use of such restraint rises to the level of conscience-shocking conduct.  Norris was restrained in this manner only after she had threatened her own safety by stating that she was going to pull her PICC line out and bleed to death, and only after she had previously shown that having her hands handcuffed behind her back was alone not an adequate form of restraint.  Engles was faced with a situation that required her to take action to protect Norris from seriously harming herself.  Given these circumstances, and notwithstanding the fact that Norris was cuffed to the floor-grate toilet, the type of restraint used by Engles was not so egregious or outrageous as to be considered conscience-shocking.  Likewise, the duration of Norris's restraint, while not insubstantial, was not so lengthy as to warrant a finding that it was conscience-shocking.  True, other, less draconian, methods of restraint, had they been available, might well have been preferable in this situation.  Given the totality of the facts surrounding this case, however, Engles's conduct does not shock the conscience, and thus Norris has failed to establish a constitutional violation.[5]

---

[5]We note that the cases cited by Norris do not support a claim that Engles's actions were conscience-shocking, for they all relied primarily upon either the Fourth or Eighth Amendments to find a constitutional violation, and did not undertake a substantive due process "shocks the conscience" analysis.  Hope v. Pelzer, 536 U.S. 730, 736-38 (2002); Cruz v. City of Laramie, 239 F.3d 1183, 1188 (10th Cir. 2001);

Because Norris has failed to establish a constitutional violation, we need not consider whether her constitutional right to due process was clearly established for purposes of qualified immunity. Saucier v. Katz, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

## III.

That portion of the district court's decision denying Engles's motion for summary judgment on the basis of qualified immunity is reversed, and the case is remanded to the district court for the entry of judgment granting that motion and for further proceedings on the excessive force claim.

_____

Buckley v. Rogerson, 133 F.3d 1125, 1129 (8th Cir. 1998). In addition, they all involved circumstances readily distinguishable from those present here. See Hope, 536 U.S. at 733-35 (inmate was handcuffed, above shoulder level, to a hitching post for disruptive conduct on two occasions, one of which lasted for seven hours without regular water breaks and no bathroom breaks); Cruz, 239 F.3d at 1186, 1188 (individual, who was under the influence of cocaine, died after he was arrested and placed in a "hog-tie" restraint, which involved cuffing the individual's arms behind his back, binding his ankles together, securing his ankles to his wrist with twelve inches or less of separation, and then placing him face down on the ground); Buckley, 133 F.3d at 1127-31 (while confined in a psychiatric hospital, prison inmate was routinely placed in restraints or in segregation in non-emergency situations).